**BARKER et al., Appellees,**

v.

**NETCARE CORPORATION et al., Appellants.***

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–230.

Decided Dec. 11, 2001.

---

* Reporter's Note: An appeal to the Supreme Court of Ohio was not allowed in 95 Ohio St.3d 1421, 2002-Ohio-1737, 766 N.E.2d 161.

2

**4**

Philip M. Collins & Assoc. and Douglas R. Jennings, for appellees.

Lane, Alton & Horst, Gregory D. Rankin and Alvin E. Mathews, for appellants.

BOWMAN, Judge.

{¶ 1}   On September 17, 1998, plaintiffs-appellees, Janice Barker ("Barker") and her husband, James Barker, filed an action against defendants-appellants, Netcare Corporation, Ruby Scott–Edwards, L.S.W., Patrick Jones, R.N., and Liberato Basobas, M.D., for false imprisonment, intentional infliction of emotional distress, negligent hiring, training or supervision, negligence, and loss of consortium.   The claims were based on an incident which occurred on August 26, 1998, at Netcare when Barker was medicated with Haldol and Cogentin by Patrick Jones at the direction of Liberato Basobas, and physically restrained.

{¶ 2}   Appellants filed a motion for summary judgment based on statutory immunity as set forth in R.C. 5122.34.  Barker filed a memorandum contra and leave to file a motion for partial summary judgment arguing that appellants were not entitled to immunity pursuant to R.C. 5122.34 because they failed to commence emergency involuntary commitment proceedings in accordance with Ohio law.   Both appellants' motion for summary judgment and Barker's motion for leave were denied.

{¶ 3}   Although there is no entry in the file, there is no disagreement that Barker dismissed her claims of negligence and negligent hiring, training, and supervision, and her husband dismissed his claim for loss of consortium.   Thus, Barker proceeded to trial on the false imprisonment and intentional infliction of emotional distress claims.

{¶ 4}   The jury found that appellants had intentionally restrained or confined Barker without lawful privilege or without consent, but that the conduct was not extreme or outrageous.   The jury also found that Barker did not suffer serious emotional distress; however, the jury found that appellants acted with insult or actual malice and awarded Barker $50,000 in compensatory damages, $100,000 in punitive damages and found appellants liable for attorney fees, which the trial court set at $49,797.

{¶ 5}   Barker filed a motion for costs, which was granted in part only as to her request for filing fees;  Barker's motion for prejudgment interest was denied.

Appellants filed a motion for a judgment notwithstanding the verdict, new trial, or, in the alternative, for remittitur, which was overruled. After the trial court awarded attorney fees, appellants filed a notice of appeal and raises the following assignments of error:

### Assignment of Error No. 1:

{¶ 6} "The trial court erred in denying appellants' motion for summary judgment (and directed verdict) because there was no genuine issue as to any material fact regarding whether appellants acted in good faith or with professional judgment in their determination to medicate and restrain appellee."

### Assignment of Error No. 2:

{¶ 7} "The trial court erred in denying appellants' motion for a directed verdict and post-trial motions on the question of whether punitive damages were warranted against mental health professionals assisting a patient who was experiencing symptoms of her mental illness."

### Assignment of Error No. 3:

{¶ 8} "The trial court erred in denying appellants' motion for a directed verdict and post-trial motions regarding appellee's failure to offer expert testimony regarding the alleged lack of good faith or professional judgment exercised by mental health professionals medicating and restraining appellee."

### Assignment of Error No. 4:

{¶ 9} "The trial court erred in overruling defendants' motion for a new trial based upon the fact that the jury's verdict award of compensatory damages in the amount of $50,000 was excessive and against the manifest weight of the evidence."

{¶ 10} In support of their motion for summary judgment, appellants presented the depositions of Dr. Liberator Basobas, Ruby Scott Edwards, L.S.W., Patrick Jones, R.N., and Faith Payton, R.N., and Barker's records from that night. In response, Barker submitted her own affidavit.

{¶ 11} On August 25, 1998, Barker called the Franklin County Sheriff to report that she had been raped the week before. One of the deputies testified that, upon arrival at her home, he observed that Barker was very upset, raising her voice, and was out of control and crawling on the sidewalk. He also testified that Barker told him that she had cut her hair, removed the caps from her teeth and put Tabasco sauce on the floor to prevent people from entering her house. The deputies recommended that she receive counseling at Netcare. When Barker agreed, the deputies transported her to Netcare.

{¶ 12} Faith Payton was the nurse on duty when Barker arrived at Netcare. Although Payton's shift ended at midnight, she stayed and completed the nursing assessment because Barker was a rape victim and the nurse on the next shift was a male. Payton telephoned Dr. Basobas, the on-call doctor, and told him about Barker. Payton told the doctor Barker's age, vital signs, the medications Barker had been taking and her psychiatric history. Dr. Basobas then ordered Lithium and Ativan to calm Barker. Payton testified that the medicine did not have a noticeable effect on Barker while Payton was observing her. Payton did testify that Barker made vague statements about someone putting her (Barker) out of her misery and killing her, and at that time Payton believed that Barker could potentially be a danger to herself.

{¶ 13} Ruby Scott–Edwards was the next person to have contact with Barker that night. Scott–Edwards is a licensed social worker, and she interviewed Barker and was in charge of her care that evening. Scott–Edwards testified that Barker was exhibiting symptoms that were not typical of a rape victim, such as her inability to sit still, manic depression, and changes in the details of her story. Scott–Edwards stated that there was no written statement as provided for in R.C. 5122.10 involved in this case and that she believed that Barker should be a voluntary holdover, which involved spending the night at Netcare and seeing a doctor in the morning. Scott–Edwards stated that Barker made statements that she believed the perpetrator of the rape would avoid any consequences and perhaps she should do something to him. Scott–Edwards stated that, after Barker agreed to stay and see a physician in the morning, Scott–Edwards explained the rules and told Barker that she was not permitted to go outside or to smoke. Barker became upset and left Netcare at approximately 2:10 a.m., but Barker returned to the building at 2:20 a.m., and agreed to stay. Barker testified that she went outside to smoke a cigarette. Scott–Edwards stated that she offered Barker a Nicoderm patch and a shower, and another employee heard Barker banging her head in the shower. After the shower, at approximately 3:25 a.m., Scott–Edwards provided Barker with the choice to stay at Netcare or leave if her husband was home but, when Barker's husband did not answer the telephone, Barker became more agitated. Barker made a comment that her husband was probably having a good time and then she left Netcare at approximately 3:30 a.m. Scott–Edwards testified that Dr. Basobas was called and he advised them to call the Columbus Police Department. Scott–Edwards testified that the police were called because of Barker's indecision about staying, banging her head in the shower, the inability to reach her husband to take care of her, and because it was unsafe for Barker to be outside dressed in hospital gowns at that time of day. When the police returned Barker, Barker began cursing and making sexual innuendoes toward the police. The police escorted Barker back inside Netcare and she was placed in physical restraints because Dr. Basobas had

advised them to do so if necessary. Scott–Edwards also testified that she believed that Barker was a danger to herself because "she was not doing things that were safe because she was in a crisis; based on what she was saying due to her rape. She was not making rational decisions, I felt, and she would not be safe being outside in gowns or going outside saying I'm going to make sure I'm robbed and that I'm killed." (Scott–Edwards Depo. at 98.) Scott–Edwards testified that Dr. Basobas made the decision to employ restraints.

{¶ 14} The deposition testimony of Patrick Jones, R.N., was also submitted to support the motion for summary judgment. Jones was the nurse on duty that evening. His first contact with Barker was after the nursing assessment was finished and he gave Barker medication at 2:00 a.m. Jones testified that, between 3:00 and 3:15 a.m., the staff determined that Barker should be a holdover and Barker agreed to stay. At approximately 3:15 a.m., Jones applied a Nicoderm patch and heard Barker make a comment that her husband was probably partying while she was there. Jones called Dr. Basobas and wanted an involuntary holdover order from the doctor. Then Barker left Netcare wearing two hospital gowns and made a comment that she wanted to be raped and murdered. When the police returned Barker, she was disgruntled and loud. Jones stated that Barker took a shower after she was returned by the police and that he saw Barker hit her head against the shower wall at least one time. Jones also testified that Barker was restrained because of the head banging and that he received the doctor's orders for the restraint after Jones and the others had put Barker in the restraints.

{¶ 15} The deposition testimony of Dr. Basobas was also submitted in support of the motion for summary judgment. Dr. Basobas testified that, if a patient is trying to escape from Netcare, a nurse can detain the patient and then talk to the doctor. If a restraint is used to protect an individual, a nurse decides to use the restraints and then calls the doctor. Dr. Basobas testified that he gathered information concerning Barker during the first two telephone calls and he diagnosed her as suffering from bipolar disorder. Dr. Basobas testified that, when the police escorted Barker back to Netcare, she was agitated and combative, and the nurse could not contend with her verbally. Dr. Basobas told the nurse to sedate Barker and she could be evaluated in the morning. Dr. Basobas testified that, prior to Barker leaving Netcare at approximately 3:30 a.m., she had been a voluntary holdover patient but, after her return, she became an involuntary holdover patient. Dr. Basobas also testified he was called when Barker left Netcare and he ordered the staff to call the police to have her brought back. Dr. Basobas testified that Jones called him a fourth time at 4:00 a.m., and told him that Barker was combative, even kicking the police officers, not directable and very agitated, so Jones placed her under restraint. It was during this phone

conversation that Dr. Basobas approved the restraints. Dr. Basobas never met Barker until the trial.

{¶ 16} In addition to the evidence discussed in conjunction with the motion for summary judgment, the following additional evidence was presented at trial.

{¶ 17} Barker testified that she had been raped on August 20, 1998. On August 25, 1998, at the urging of her husband, she called the Franklin County Sheriff's Department to report the rape. When the deputy arrived, she was very upset, and she was crying and very angry. The deputy suggested she go to Netcare for help and she agreed because she believed that she would receive rape-crisis counseling. She was interviewed by a nurse, Faith Payton, who took a brief medical history and she also was interviewed by a licensed social worker, Ruby Scott–Edwards. At approximately 2:00 a.m., she did go outside the facility to smoke a cigarette because she was not permitted to smoke inside. When she returned, she testified that she asked to use the phone and was told that the phones were not working. She wanted to go home but was told that she was not allowed to go home. She took a shower and threw her clothes out the door of the bathroom as she was told to do. She hit her head on the wall a few times because she was frustrated that the employees would not listen to her, but did not hit it hard enough to injure herself. Barker demonstrated the head banging for the jury. Eventually she ran out of the facility because she felt as if she did not belong there and she intended to walk down Broad Street to use a pay phone to call her husband. She was dressed in two hospital gowns and was stopped by the police, who took her back to Netcare. She refused to get out of the cruiser, and the police officers and Netcare personnel pulled her out of the cruiser and dragged her inside, where she was physically restrained and drugged. She passed out from the drugs and, when she awoke in the morning, she was permitted to call her husband. She was interviewed by a staff psychiatrist who concluded that Barker was not a danger to herself or others and sent her home:

{¶ 18} Barker testified that she did not consent to stay at Netcare, to be drugged or restrained. When she attempted to leave, Barker testified that the Netcare personnel would not return her clothes and that the police physically returned her to Netcare.

{¶ 19} In addition to the testimony in her deposition, Scott Edwards testified at trial that the justification for restraining Barker was that Barker had been banging her head against the shower wall, Barker stated that she hoped she would be raped and killed, and she was walking outside at 3:30 a.m. dressed in two hospital gowns; however, Scott–Edwards also testified that she did not see Barker bang her head against the wall and Barker was not injured by this action. Scott–Edwards testified that she interpreted Barker's comments about being raped and killed as anger, and that Barker did not actually hope for those things.

Scott–Edwards stated that she was not concerned when Barker left the facility earlier at 2:00 a.m. Barker was told that she could leave if her husband was home and a phone call was placed to a cab company at 3:22 a.m. The tape of the telephone call placed to the Columbus Police Department by Scott–Edwards at 3:25 a.m. was played for the jury:

{¶ 20}  "Hi. This is Ruby. I'm a clinician at Netcare, 199 South Central.

{¶ 21}  "Uh-huh.

{¶ 22}  "I'm calling because we had a client that left against the hospital advice.  She was a rape victim, and she came in—she was brought in by the Sheriff's office from Galloway, and she just left on her own.

{¶ 23}  "She left previously, but she came back in, but she's having a lot of issues.  I guess she's kind of wanting things to go her way, so she wants to leave.

{¶ 24}  "So she started saying that she didn't realize that drug addicts were here, et cetera, et cetera, and she wanted an excuse to leave.  So she left out with only two gowns on, and I'm concerned about that, the fact that she's just only got two gowns on.

{¶ 25}  "I don't know which direction she went.  There's a police car at Central almost near Broad with the lights flashing.  I don't know whether that has anything to do with her or not.  There's one over here, too.  I'm outside now trying to see if we could see which direction she went.  We had given her the option[.]"

{¶ 26}  The transcript of the telephone call does not indicate that Scott–Edwards·believed that Barker represented a danger to herself or to others.

{¶ 27}  Jones testified at the trial that he called Dr. Basobas three times that evening.  At 3:45 a.m., he received an order from Dr. Basobas to restrain Barker to prevent harm to herself and others.  Jones stated that he told Dr. Basobas that Barker had "eloped" in her hospital gowns, that she refused to leave the police cruiser, and that she was still agitated.  He also stated that he asked for the restraint order.  Jones also stated that he heard Barker yelling but did not see her physically resisting the police as she was brought back into Netcare.

{¶ 28}  Dr. Basobas testified at the trial that, during the first telephone call from Payton, he had diagnosed Barker with bipolar disorder based upon her history and her prescribed medications.  He also stated that, during the phone conversation with Jones at 3:45 a.m., he told Jones to have the police bring Barker back to Netcare because she was on the street at the time dressed in hospital gowns and might be raped.  He later added that he was also concerned because of Barker's history and he believed that she had threatened to kill the man who had raped her and, thus, she presented a substantial risk of harm.

{¶ 29} One of the final witnesses was Dr. John M. Davis, a staff psychiatrist at Netcare, who examined Barker and released her in the morning. Dr. Davis testified that, although he believed the restraints were appropriate, Barker's recent history of rape was a factor against using the restraints because restraints can reawaken feelings of vulnerability. Netcare's printed "Restraint Report" form, which is to be completed if restraints are used, lists among contraindications for use of restraint psychological reasons because of a history of physical or sexual abuse. Dr. Davis testified that the use of restraints is not appropriate for voluntary patients but, when Barker was returned to Netcare by the police and Dr. Basobas ordered her to be a holdover, she became an involuntary patient by Netcare standards, even though no written statement was prepared as required by R.C. 5122.10.

{¶ 30} The testimony at trial was disputed as to whether Dr. Basobas had been called after the first call placed by Payton after she completed the nursing assessment. Scott–Edwards, Jones, and Dr. Basobas testified that the Netcare phones were not always working properly. In case of failure, cellular phones were used. The calls to Barker's husband, the cab company, and the Columbus police were recorded on the cellular phone bill but the calls to the doctor were not except for the initial 12:18 a.m. call from Payton. Jones was asked about the calls to Dr. Basobas during his deposition and he believed that he used the cellular phone to call Dr. Basobas; however, at trial, Jones testified that he did not use the cellular phone.

{¶ 31} Another area of disputed testimony involved Barker's records. Scott–Edwards admitted that she wrote her progress notes all at one time, near the end of her shift, rather than as the events occurred. She had kept notes that she used to write the progress notes but she had shredded the notes after the progress notes were written.

{¶ 32} Given that the evidence presented and the issues argued are substantially similar, the first and second assignments of error shall be addressed together.

{¶ 33} By the first assignment of error, appellants contend that the trial court erred in denying their motions for summary judgment and directed verdict because there was no genuine issue as to any material fact regarding whether appellants acted in good faith or with professional judgment in their determination to medicate and restrain Barker and, thus, they were entitled to immunity pursuant to R.C. 5122.34.

{¶ 34} By the second assignment of error, appellants contend that the trial court erred in denying their motion for a directed verdict as to the claim of false imprisonment, arguing they had lawful privilege to restrain Barker. As to the intentional infliction of emotional distress claim, appellants argue that their

conduct did not constitute outrageous misconduct. Last, appellants argue that their post-trial motions on the question of whether punitive damages were warranted against mental health professionals assisting a patient who was experiencing symptoms of a mental illness should have been granted. Appellants had moved for a directed verdict on the ground that Barker failed to present evidence of malice sufficient to warrant punitive damages. The trial court overruled the motion. Appellants also filed, pursuant to Civ.R. 50(B), a motion for judgment notwithstanding the verdict, a new trial, or, in the alternative, for remittitur, which was also overruled.

{¶ 35} To prevail on a motion for summary judgment, the moving party must demonstrate that, when the evidence is construed most strongly in favor of the nonmoving party, no genuine issue of material fact remains to be litigated and that it is entitled to judgment as a matter of law. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A genuine issue of material fact exists unless it is clear that reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150, 151, 66 O.O.2d 311, 309 N.E.2d 924. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously, with any doubts resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138.

{¶ 36} In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, the Supreme Court of Ohio stated that the moving party, on the ground that the nonmoving party cannot prove its case, has the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. Once the moving party satisfies this initial burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. The issue presented by a motion for summary judgment is not the weight of the evidence, but whether there is sufficient evidence of the character and quality set forth in Civ.R. 56 to show the existence or nonexistence of genuine issues of fact.

{¶ 37} When an appellate court reviews a trial court's disposition of a summary judgment motion, the appellate court applies the same standard as applied by the trial court. *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765. An appellate court's review of a summary judgment disposition is independent and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. Thus, in determining whether a trial court properly granted a summary judgment motion, an appellate court must review the

evidence in accordance with the standard set forth in Civ.R. 56, as well as the applicable law.  *Murphy.*

{¶ 38}  "False imprisonment occurs when a person confines another intentionally ' "without lawful privilege and against his consent within a limited area for any appreciable time, however short." ' "  *Bennett v. Ohio Dept. of Rehab. & Corr.* (1991), 60 Ohio St.3d 107, 109, 573 N.E.2d 633.  Appellants claim that they had lawful privilege to hold Barker because they acted in good faith and were entitled to immunity pursuant to R.C. 5122.34.

{¶ 39}  Appellants have the burden to prove legal justification for the restraint.  *Johnson v. Reddy* (1955), 163 Ohio St. 347, 352, 56 O.O. 316, 126 N.E.2d 911.  The power to restrain psychiatric patients is provided by statute.  R.C. Chapter 5122 sets forth a standard for committing a person to a mental health facility.  An involuntary commitment may be initiated either through a non-emergency commitment (R.C. 5122.11) or emergency commitment (R.C. 5122.10).  R.C. 5122.10 provides for emergency commitment, as follows:

{¶ 40}  "Any psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer, or sheriff may take a person into custody * * * if the psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer, or sheriff *has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (B) of section 5122.01 of the Revised Code,* and represents a substantial risk of physical harm to self or others if allowed to remain at liberty pending examination.

{¶ 41}  *"A written statement shall be given to such hospital* by the transporting psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer, chief of the adult parole authority, parole or probation officer, or sheriff *stating the circumstances under which such person was taken into custody and the reasons for the* psychiatrist's, licensed clinical psychologist's, licensed physician's, health officer's, parole officer's, police officer's, chief of the adult parole authority's, parole or probation officer's, or sheriff's *belief.*  This statement shall be made available to the respondent or the respondent's attorney upon request of either.

{¶ 42}  "* * *

{¶ 43}  "A person transported or transferred to a hospital or community mental health agency under this section shall be examined by the staff of the hospital or agency within twenty-four hours after arrival at the hospital or agency.  If to conduct the examination requires that the person remain overnight, the hospital or agency shall admit the person in an unclassified status until making a disposition under this section.  After the examination, if the chief

clinical officer of the hospital or agency believes that the person is not a mentally ill person subject to hospitalization by court order, the chief clinical officer shall release or discharge the person immediately unless a court has issued a temporary order of detention applicable to the person under section 5122.11 of the Revised Code. After the examination, if the chief clinical officer believes that the person is a mentally ill person subject to hospitalization by court order, the chief clinical officer may detain the person for not more than three court days following the day of the examination and during such period admit the person as a voluntary patient under section 5122.02 of the Revised Code or file an affidavit under section 5122.11 of the Revised Code. * * *" (Emphasis added.)

{¶ 44} The emergency commitment is based upon a person being taken into custody without first being afforded a hearing because that person is mentally ill and represents a substantial risk of physical harm to oneself or to others if allowed to remain at liberty pending examination. R.C. 5122.10 requires a written statement to be given to such hospital by the transporting psychiatrist, licensed clinical psychologist, licensed physician, health officer, parole officer, police officer, chief of the Adult Parole Authority, parole or probation officer, or sheriff stating the circumstances under which such person was taken into custody and the reasons for such belief. Thus, in this case, the written statement could have been completed only by the Franklin County Sheriff deputies, the Columbus police, or a doctor at Netcare.

{¶ 45} Appellants argue that they are entitled to immunity, pursuant to R.C. 5122.34, which provides as follows:

{¶ 46} "Persons, including * * * mental health agencies, acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge, determination of appropriate placement, * * * do not come within any criminal provisions and are free from any liability to the person hospitalized or to any other person. * * *"

{¶ 47} The trial court found that appellants were not entitled to immunity, pursuant to R.C. 5122.34, since there was no written statement by the Columbus police or Dr. Basobas setting forth the basis for taking Barker into custody, as required by R.C. 5122.10. Inasmuch as appellants failed to comply with the requirements of R.C. 5122.10, the court concluded they were not entitled to immunity pursuant to R.C. 5122.34.[1] Appellants argue that the trial court erred

---

1. Although the trial court found that only Dr. Basobas or the Columbus police were authorized to complete the written statement, pursuant to R.C. 5122.10, in this case, the Franklin County Sheriff deputies were also involved and could have completed the written statement.

in this decision because they are entitled to immunity and they acted in good faith.

{¶ 48} "R.C. 5122.34 does not apply to immunize mental health professionals from liability in all contexts." *Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 304, 673 N.E.2d 1311. The grant of immunity presupposes that affirmative action was taken under R.C. Chapter 5122. Id. The preparation of the written statement explaining the basis for the detention "is a requirement for the initiation of an emergency involuntary commitment. The statement ensures the existence of probable cause to support the involuntary commitment of a person who may be mentally ill and in need of court-ordered hospitalization." *In re Miller* (1992), 63 Ohio St.3d 99, 585 N.E.2d 396, paragraph one of the syllabus.

{¶ 49} In this instance, no written statement was prepared as required by R.C. 5122.10. While there is some evidence appellants questioned Barker's mental health, there is no evidence appellants believed that Barker was a mentally ill person subject to hospitalization by court order. Because there is no evidence appellants complied with or were proceeding pursuant to R.C. 5122.10, the trial court did not err in finding that appellants were not entitled to immunity pursuant to R.C. 5122.34.

{¶ 50} Appellants also argue that they are entitled to immunity because they acted in good faith. Inasmuch as the statutory procedure was not followed, the immunity provided by the statute does not apply, and we do not need to determine whether appellants' actions were taken in good faith, as that issue does not arise. Appellants failed to meet their burden to show an entitlement to immunity.

{¶ 51} Appellants also argue that the trial court erred in denying them a directed verdict on the issue of immunity. Civ.R. 50(A)(4) governs the standard for directed verdicts and provides:

{¶ 52} "* * * When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 53} In ruling on a motion for a directed verdict, a trial court is required to construe the evidence most strongly in favor of the nonmovant. Civ.R. 50(A)(4); *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 423 N.E.2d 467. The motion must be denied where there is substantial evidence to support the nonmoving party's case and reasonable minds may reach

different conclusions. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon the motion. Id. A motion for directed verdict tests whether the evidence presented is legally sufficient to take the case to the jury. *Wagner v. Midwestern Indemn. Co.* (1998), 83 Ohio St.3d 287, 294, 699 N.E.2d 507.

{¶ 54} Appellants make no further argument other than that the trial court erred in denying them immunity pursuant to R.C. 5122.34. As discussed above, appellants were not entitled to such protection. Appellants' first assignment of error is not well taken.

{¶ 55} The standard for determining a judgment notwithstanding the verdict is whether the verdict is one which could be reasonably reached from the evidence. See *Hartford Cas. Ins. Co. v. Easley* (1993), 90 Ohio App.3d 525, 530, 630 N.E.2d 6. A trial court must construe the evidence most strongly in favor of the party against whom the motion is made and, where there is substantial evidence to support that party and reasonable minds could reach different conclusions, the motion for judgment notwithstanding the verdict must be denied. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334. "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)." *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271.

{¶ 56} R.C. 2315.21 provides that punitive damages may be awarded only in tort actions in which actual damages have been proven and actual malice is involved. The actual malice necessary for punitive damages is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174. "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 37, 543 N.E.2d 464. Barker admitted that there was no evidence of hatred, ill will or spirit of revenge involved in this case.

{¶ 57} In this case, however, there is evidence to support the jury verdict that appellants acted with a conscious disregard for the rights and safety of Barker that had a great probability of causing substantial harm and can be characterized as reckless, wanton, willful, or gross.

{¶ 58} None of the testimony describes any behavior by Barker, between the time the cab was called at 3:22 a.m. and she was told she could go home and when the police returned her to Netcare at 4:00 a.m., that explained why Barker should be held against her will. While the Netcare personnel were concerned for Barker's physical safety, that does not explain why she was forced to return to Netcare rather than being sent home. After being dragged back into Netcare, Barker was physically restrained and given drugs. Dr. Davis testified that use of such restraints can awaken feelings of vulnerability in cases of rape victims. Given the testimony of this case, the jury could find that appellants exercised a conscious disregard for the rights and safety of Barker that had a great probability of causing substantial harm. The trial court did not err in denying appellants' motion for a directed verdict or judgment notwithstanding the verdict. The post-trial motions on the question of whether punitive damages were warranted were properly overruled. Appellants' second assignment of error is not well taken.

{¶ 59} By the third assignment of error, appellants contend that the trial court erred in denying their motion for a directed verdict and post-trial motions regarding appellees' failure to offer expert testimony regarding the alleged lack of good faith or professional judgment exercised by mental health professionals medicating and restraining Barker. As discussed above, appellants argue that they demonstrated that appellants exercised proper professional judgment and that Barker did not present expert testimony to the contrary. False imprisonment occurs when a person confines another intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short. Appellants claim that they had a lawful privilege to hold Barker because they acted in good faith and were entitled to immunity pursuant to R.C. 5122.34. As discussed in the first assignment of error, appellants have the burden to prove legal justification for the restraint and the only justification was to follow the statutory procedure set forth in R.C. 5122.10, which was not done in this case. As appellants failed to prove that they were proceeding pursuant to R.C. 5122.10, and were therefore not entitled to immunity, Barker was not required to provide contrary evidence because such testimony would be irrelevant in this case. Appellants' third assignment of error is not well taken.

{¶ 60} By the fourth assignment of error, appellants contend that the trial court erred in overruling their motion for a new trial based upon the fact that the jury's award of compensatory damages in the amount of $50,000 was excessive and against the manifest weight of the evidence. Civ.R. 59(A) permits a new trial to be granted upon the following grounds:

{¶ 61} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

{¶ 62}  "* * *

{¶ 63}  "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

{¶ 64}  "* * *

{¶ 65}  "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]"

{¶ 66}  In *Mannion v. Sandel* (2001), 91 Ohio St.3d 318, 744 N.E.2d 759, the Supreme Court of Ohio examined the requirements for granting a new trial. The court was guided by the first paragraph of the syllabus of *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, which provides:

{¶ 67}  "Where a trial court is authorized to grant a new trial for a reason which requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court."

{¶ 68}  Thus, we review a trial court's decision under the abuse-of-discretion standard. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. Here, the trial court denied the motion for a new trial.

{¶ 69}  Appellants argue that the jury award of compensatory damages was excessive and against the manifest weight of the evidence. Barker testified that she sustained bruises and cuts on her thighs and wrists. On cross-examination, she acknowledged that it was possible that, during an interview with a detective from the Franklin County Sheriff's Office, she had stated that the cuts and bruises were caused by the police when they brought her back into Netcare. The day she was released from Netcare, Barker visited her family physician and his records indicate that Barker told him that the bruises and cuts were caused by the police. Barker did not visit her treating psychiatrist any more frequently following the incident at Netcare than she had before the incident.

{¶ 70}  However, Barker also testified that she had four scars where the restraints had cut her. She also described the emotional distress she had suffered as follows:

{¶ 71}  "I'll never ever forget going there. I felt like I had been violated all over again. I went in there to get help for the rape, and it made me feel like I had been violated and my rights taken away. It scared me, and they hurt me."

{¶ 72}  On cross-examination, she testified that the gouges in her skin were made by the restraints, not the police.

{¶ 73} Barker's husband also testified and stated that Barker had gouges on her wrists from the restraints and bruises on her ankles, arms, thighs, and wrists. He also stated that Barker has suffered personality changes since the incident, as follows: "She has not been her emotional self. She still is weepy, and she thinks back on this. She sees a sheriff's car, that reminds her of this or something, and she gets very depressed and weepy and withdrawn." He also described her as "less trusting * * * [o]f the system" now. "[L]ay witnesses who are closely acquainted with the injured party are completely competent to testify to this type of damage." *Doyle v. Fairfield Machine Co., Inc.* (1997), 120 Ohio App.3d 192, 221–222, 697 N.E.2d 667. "Since pain and suffering are subjective feelings, the injured person's testimony is the only direct proof of such damages. An expert can support such evidence only indirectly. Therefore, lay testimony is sufficient by itself to prove past pain and suffering damages." *Youssef v. Jones* (1991), 77 Ohio App.3d 500, 505, 602 N.E.2d 1176. The jury could properly consider humiliation, injury to feelings, and mental suffering that resulted from the wrongful imprisonment. *Doyle* at 220, 697 N.E.2d 667. In *Turner v. Barrett* (1980), 68 Ohio App.2d 80, 81, 22 O.O.3d 74, 426 N.E.2d 1193, this court determined that expert medical testimony is not required in every case to determine the extent of injuries, pain, and suffering. Given the facts of this case, and appellants' failure to comply with R.C. Chapter 5122, the trial court did not abuse its discretion in overruling appellants' motion for a new trial. Appellants' fourth assignment of error is not well taken.

{¶ 74} For the foregoing reasons, appellants' four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

PETREE and McCORMAC, JJ., concur.

JOHN W. McCORMAC, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.