Thomas JOCKS, Plaintiff–Appellee–Cross–Appellant,

v.

Augusto TAVERNIER and The New York City Police Department, Defendants–Appellants,

Michael A. Oggeri, Defendant–Cross–Appellee,

City of New York, Nassau County Police Department, and County of Nassau, Defendants.

Docket Nos. 00–7943, 00–7965, 00–7735, 00–7737, 00–7743.

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 2001.

Decided: Jan. 8, 2003.

130

 

Richard W. Young, Babylon, NY, for Plaintiff–Appellee Thomas Jocks.

Raymond E. Kerno, (Cronin & Byczek, LLP, on the brief), Mineola, NY, for Defendant–Appellant Augusto Tavernier.

Fay NG, Assistant Corporation Counsel (Michael D. Hess, Corporation Counsel of the City of New York, Elizabeth S. Natrella, Assistant Corporation Counsel, on the brief), New York, NY, for Defendants–Appellees City of New York and the New York Police Department.

Steven Jay Harfenist, Friedman & Harfenist, Lake Success, NY, for Defendant–Appellee Michael A. Oggeri.

Before: WALKER, Chief Judge, LEVAL and SOTOMAYOR, Circuit Judges.

JOHN M.WALKER, Jr., Chief Judge.

Plaintiff Thomas Jocks brought false arrest and malicious prosecution claims under state law and 42 U.S.C. § 1983 against Officer Augusto Tavernier and Detective Michael Oggeri. The United States District Court for the Eastern District of New York (Thomas C. Platt, Sr., *District Judge*) dismissed the claims against Oggeri and, after a jury trial, awarded judgment on both claims against Tavernier for a total of more than $600,000 in damages. Tavernier appeals the judgment against him, and Jocks appeals the dismissal of his claims against Oggeri. Tavernier also appeals from the district court's refusal to order New York City to indemnify him. New York City appeals an award of sanctions. We vacate the district court's judgments against Tavernier and in favor of Oggeri and remand both for a new trial. We also vacate the award of sanctions.

## BACKGROUND

This case arises out of an altercation between a truck driver and an off-duty

New York City police officer near the Long Island Expressway on October 11, 1994. Depending upon whose testimony at trial is credited, the incident could be described as either a dedicated trucker struggling to eliminate a public hazard on the highway, arrested at gunpoint and maliciously harassed with criminal charges for his trouble; or an aggressive assailant striking an off-duty police officer without justification and being promptly and appropriately arrested. In our recitation of the facts, we lay out the respective positions.

No party disputes the initial events that led to the incident. Plaintiff Thomas Jocks, a professional truck driver, was driving his tractor trailer east on the Long Island Expressway when the engine failed. Jocks attempted to drive the truck onto the shoulder to avoid blocking traffic. When the truck came to a stop, approximately four feet of the trailer still projected into the right-hand eastbound lane of the Expressway. After being unable to restart the truck, Jocks disengaged the tractor from the trailer and moved it forward for safety reasons. He then placed three emergency reflective triangles at hundred-foot intervals behind the truck, as required by state regulations. Jocks tried unsuccessfully to flag down passing motorists and noticed that a hill obstructed motorists' view of the truck, forcing them to swerve to avoid it.

Jocks then ran approximately three-quarters of a mile to a gas station and convenience store. He first went into the convenience store, but the clerk, whose English skills were limited, refused to allow Jocks to use the store phone. Jocks then went outside to the only pay phone in the vicinity. The phone was designed with a longer cord to be used from a vehicle, and defendant Augusto Tavernier, an off-

duty New York City police officer, was using it while seated in his van.

At this point, the stories related by the two men diverge. Jocks testified that he took the following steps to convince Tavernier of the emergency. Upon approaching the vehicle, Jocks informed Tavernier that there was an emergency because his truck was blocking the right-hand lane of the Expressway. Tavernier replied that he should find another phone and continued his conversation. Jocks told him again that the situation was an emergency. Tavernier again refused to yield the phone and swore at Jocks. Jocks knocked on the windshield of the van and informed him yet again of the emergency.

After Tavernier continued to ignore Jocks, Jocks disconnected his call by pressing down the hook of the telephone. Tavernier then threw the receiver at Jocks. Tavernier attempted to get out of his vehicle, but he was unable because the phone stand blocked the door. Tavernier drove the car forward 15 to 20 feet. Jocks began dialing 911 when Tavernier charged him and screamed at him, "[I]f I can't use the phone—you can't use the phone." Tavernier pushed Jocks out of the way and hung up the phone. Jocks and Tavernier yelled at each other briefly, and Jocks reiterated that the situation was an emergency. Tavernier then said, "[W]hy don't I blow your fucking brains out," and drew his service pistol. Jocks threw the phone handset back at Tavernier, striking him in the mouth, and ran towards the gas station. Tavernier ran him down, said "freeze, police," and pressed the gun into the back of Jocks's head as he walked him into the gas station. Tavernier repeated his threat to "blow [Jocks's] brains out." Shortly thereafter, an off-duty Nassau County police officer arrived, ordered Tavernier to put down his weapon and show identification, and stabilized the situation

until the Nassau County police arrived. As soon as the uniformed police arrived, the off-duty police officer left and a uniformed police officer arrested Jocks based on Tavernier's account of the events.

Tavernier's testimony differs from that of Jocks in numerous important aspects. He testified that Jocks approached, waited for a minute or two, and then simply told Tavernier that he needed the phone, without mentioning an emergency. Tavernier refused to end his call and told Jocks to look for another phone down the road. Jocks then ended Tavernier's call by pushing the receiver hook down, without requesting the phone again or describing an emergency. Tavernier dropped the phone out of the car, drove forward, and walked back to Jocks. Tavernier said, "If I can't use the phone, you can't use the phone either." As Tavernier reached to hang up the phone, Jocks swung the handset on its cable and struck him on the arm and in the face. Tavernier then drew his gun and displayed his shield and placed Jocks under arrest. An off-duty police officer arrived and called the Nassau County police, who took Jocks into custody.

There is also a dispute over what happened after Jocks was taken to the Second Precinct station. According to Jocks, Detective Michael Oggeri, the officer assigned to the case, informed him of his *Miranda* rights upon his arrival and Jocks expressly refused to make a statement. Soon thereafter, Oggeri discussed the case with another officer in front of Jocks, and then asked Jocks whether the other officer had described the incident accurately. Correcting the officer's description, Jocks described the same sequence of events to which he testified at trial. Oggeri later presented to Jocks a statement, in which Jocks admitted hitting Tavernier in the mouth with the phone, and asked Jocks to sign it. Jocks refused, both because the

statement was inaccurate and because he refused to sign any statement without his lawyer. Oggeri described the events differently, stating that Jocks spontaneously made the statement before being read his *Miranda* rights. Although he does not dispute that Jocks refused to sign the written statement, Oggeri maintains that it accurately reflected Jocks's verbal statement. Because the events in the precinct house were only relevant to claims that were decided against Jocks as a matter of law, we resolve all of the inconsistencies in his favor.

Jocks was kept in a holding cell until his arraignment the following morning. Over the following year, Jocks was required to make 28 court appearances, culminating in a not-guilty verdict on charges of Felony Assault and Criminal Possession of a Weapon. The litigation cost him about $20,000 in legal fees. Jocks also was terminated from his job as a truck driver, which he believes was due to the criminal case against him. None of his subsequent jobs has paid as well as his truck driving position. Jocks claims that the incident caused him embarrassment and difficulty sleeping. Perhaps most importantly to Jocks, at the time of his encounter with Tavernier, Jocks had full custody of his then-fourteen year old daughter, but as a result of his legal problems, he agreed to joint custody with his ex-wife. His daughter now lives with her mother.

Jocks brought claims under state law and 42 U.S.C. § 1983 against Tavernier and Oggeri, as well as Nassau County, the Nassau County Police Department, New York City, and the New York City Police Department, alleging false arrest and malicious prosecution. At the conclusion of the plaintiff's evidence at trial, the district court granted judgment as a matter of law in favor of all defendants except Tavernier. The jury found in Jocks's favor on both the

false arrest and malicious prosecution claims against Tavernier, awarding Jocks $300,000 and $322,000, respectively. After the trial, Tavernier renewed his motion for judgment as a matter of law and moved in the alternative for a new trial or remittitur, all of which were denied.

## DISCUSSION

Defendant Tavernier appeals from the district court's decisions denying him judgment as a matter of law, a new trial on the merits, and remittitur of the damages, and denying his cross-claim against New York City for indemnification. Jocks cross-appeals the district court's grant of judgment as a matter of law in favor of defendant Oggeri. Finally, the New York City Corporation Counsel appeals from the district court's decision to award sanctions against it.

I. Tavernier's Claims for Judgment as a Matter of Law

Tavernier argues that the district court erred when it denied his post-trial motion for judgment as a matter of law under Fed.R.Civ.P. 50. Whether the issue is raised

> on a motion for summary judgment (before trial), on a motion for a judgment as a matter of law (at trial but prior to submission to the fact finder), on a motion for a judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.

*McCarthy v. New York City Technical Coll.*, 202 F.3d 161, 167 (2d Cir.2000) (internal quotations omitted). Appellate review is *de novo*. *New Eng. Ins. Co. v.*

*Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 240 (2d Cir.2002).

■ Before considering the individual constitutional torts presented in this case, we must address the general § 1983 requirement of action under color of law. Although Tavernier claims in conclusory fashion that his actions were not under color of law, he makes no arguments of substance supporting his position. According to Tavernier's own account, he displayed his shield and identified himself as a police officer at the same time as he drew his pistol. Jocks testified that Tavernier had threatened him with the pistol before he identified himself as a police officer. Thus, according to either account, by the time Tavernier restrained Jocks, he had indicated that he was a police officer. We have no doubt that when an officer identifies himself as a police officer and uses his service pistol, he acts under color of law. *See Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.1975).

■ Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are "substantially the same" as claims for false arrest or malicious prosecution under state law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (false arrest); *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir.1984) (holding that 42 U.S.C. § 1988 requires the use of state law rules to determine the elements of malicious prosecution).

A. False Arrest

■ Under New York state law, to prevail on a claim of false arrest a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

privileged." *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). Although Tavernier maintains that he did not arrest Jocks, this claim is frivolous. He identified himself as a police officer, physically seized Jocks, transported him into the gas station office at gunpoint, and detained him until the Nassau County Police arrived. The only element seriously at issue here is whether the confinement was privileged. If probable cause existed, Tavernier as a police officer would be privileged to make an arrest. An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852; *see also Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citations omitted).

Tavernier argues that probable cause existed because striking another individual with a phone handset satisfies the elements of the crime of assault. Although Jocks concedes that the elements of assault were present, he argues that Tavernier lacked probable cause because the act was either committed in self-defense or necessary as an emergency measure. Puzzlingly, Tavernier responds that no doctrine of emergency measures exists, and that, in any event, claims of self-defense or emergency measures would simply be defenses to assault and would not eliminate probable cause.

 We believe that under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause. Under New York law, defenses are either exculpatory (eliminating culpability) or mitigating (reducing culpability). *People v. Valles,* 62 N.Y.2d 36, 476 N.Y.S.2d 50, 464 N.E.2d 418, 419 (1984). Justification, including both emergency measures and self-defense, is an exculpatory defense. *Id.;* N.Y. Penal Law §§ 35.05, 35.15 (McKinney 1997). In *Valles,* the New York Court of Appeals held that exculpatory defenses must be presented to a grand jury, whereas mitigating defenses need not, because exculpatory defenses are relevant to the grand jury's role in "protect[ing] citizens from having to defend against unfounded accusations" to which there are complete defenses. *Valles,* 476 N.Y.S.2d 50, 464 N.E.2d at 419. Although a grand jury's decision of whether probable cause exists to indict is distinct from the probable cause determination of whether an arrest is privileged, the interest in protecting the public against improper arrests is parallel to the interest in protecting the innocent against the burden of answering to an indictment. Defenses which negate the existence of a crime should similarly negate probable cause. Of course, just as probable cause may exist although a suspect is in fact innocent, probable cause may exist where the police do not know of the existence or validity of an exculpatory defense.

Tavernier argues that, even if justification can negate probable cause, he did not need to investigate potential defenses before arresting Jocks because our jurisprudence does not require him to verify whether the defense is true. *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123 (2d Cir.1997). In *Ricciuti,* we rejected the plaintiff's argument that because the police had heard his claim that he was acting in self-defense, the police were obligated to investigate his defense before arresting him. *Id.* at 128. We held that probable cause to arrest should be determined based on what the officer knew at the time of the arrest. We did not impose a duty

on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest. On the other hand, we do not read *Ricciuti* to permit an officer to deliberately disregard facts known to him which establish justification.

■ Under the circumstances of this case, a reasonable jury could have concluded that Tavernier should have known that Jocks was acting in self-defense. N.Y. Penal Law § 35.15 states,

> A person may ... use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself ... from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person ....

According to Jocks's version, which we must accept on appeal, Tavernier had pulled his gun and threatened Jocks with it. Jocks could have been acting under a threat of "imminent ... unlawful physical force." *Id.* On this version of the facts, Tavernier knew that Jocks's actions were not criminal because Jocks was acting in self-defense; a jury could therefore find that the arrest lacked probable cause. The fact that his response would likely have been insufficient against a gun does not alter the self-defense calculus. Consequently, the district court correctly denied Tavernier's motion claiming entitlement to judgment as a matter of law on the self-defense issue.

■ Jocks also claims that his actions constituted emergency measures and thus did not provide probable cause. N.Y. Penal Law § 35.05 provides, in part,

> conduct which would otherwise constitute an offense is justifiable and not criminal when: ... 2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue ....

We hold that Tavernier was entitled to partial judgment as a matter of law on this issue. He observed Jocks throwing the telephone at him, conduct that amounted to an assault and established probable cause for an arrest. It is true that Tavernier heard Jocks's unsubstantiated claims about the emergency created by the stalled truck, but under *Ricciuti,* Tavernier was neither compelled to accept these assertions at face value nor to investigate them.

### B. Malicious Prosecution

■ A malicious prosecution claim under New York law requires the plaintiff to prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997) (internal quotation marks omitted). Additionally, there must be a post-arraignment seizure for a § 1983 malicious prosecution claim; however, the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score. *Id.* at 946. Tavernier's only significant argument is that he had probable cause to commence the proceeding. This is essentially the same as the argument on the false arrest claim, and we hold that Tavernier was entitled to partial judgment as a matter of law on the

emergency measure justification but not on the self-defense justification.

## II. Tavernier's Motion for a New Trial

■ Tavernier moved after the verdict for a new trial under Fed.R.Civ.P. 59(a). On appeal, he argues both that the jury's verdict was against the weight of the evidence and that a new trial should have been ordered because of errors in the trial. The appeal on the basis of the weight of the evidence is meritless. Under our precedents, a trial court's conclusion that the jury's verdict was not against the weight of the evidence is not reviewable on appeal because of Seventh Amendment concerns. *Robinson v. Cattaraugus County*, 147 F.3d 153, 160 (2d Cir.1998).

However, Tavernier is correct that a new trial must be granted because of legal errors at the trial. As discussed above in reference to Tavernier's motion for judgment as a matter of law, we hold that the district court should not have instructed the jury on an emergency measures defense.

■ A new trial is required if errors in instructing the jury, considered as a whole, "prejudiced the objecting party." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir.2001). If the jury concluded that Jocks was acting in self-defense, as seems likely, then Tavernier was not prejudiced by the instruction. However, in light of the general verdict and the possibility that the jury based its decision in Jocks's favor on the emergency measures doctrine,

which should not have been charged, we must vacate the district court's denial of a new trial to Tavernier and order a new trial.

Because a new trial is required on the jury charge, it is unnecessary for us to consider the evidentiary issues raised by Tavernier.[1] We likewise need not consider whether the district judge correctly denied remittitur, although we note in passing that allowing significant recoveries to compensate for Jocks's lost job and for the loss of full custody of his daughter was probably not unreasonable. We similarly need not address Tavernier's cross-claim for indemnification by the New York City Police Department because the grant of a new trial has rendered this claim moot.

## III. Judgment for Oggeri as a Matter of Law

■ The trial court granted judgment as a matter of law to Detective Oggeri on both the false arrest and malicious prosecution claims. The false arrest claim was properly dismissed. Even if Oggeri is assumed to have arrested Jocks, he had probable cause to do so. Unlike Tavernier, who knew of the valid defense according to Jocks, all that Oggeri had before him was the statement of a fellow police officer that he had been assaulted and Tavernier's obvious injuries. Jocks did not make a statement to the Nassau County Police initially, and his excited statement later, even crediting his version, did not dissipate probable cause. *See Ricciu-*

---

1. Tavernier argues that he was prejudiced by the district court's exclusion of testimony of two witnesses as to the events at the payphone. After Tavernier represented that there were three witnesses to those events, but that all three were unavailable, the parties entered into a stipulation as to the testimony of one of them, but restricted its use to the issue of the reliance of Oggeri on the statements as related to his probable cause in

detaining Jocks. Later in the trial, when two of the three witnesses became available, the district court refused to allow their testimony for any purpose on the basis that the stipulation had settled the question. In light of the importance of the events at the payphone to Tavernier's liability, the exclusion of the two witnesses was probably error. However, this issue is mooted by our independent decision to remand for a new trial.

*ti,* 124 F.3d at 128. Even taking the evidence in the light most favorable to Jocks, no claim of false arrest was made out against Oggeri.

■■■■ The malicious prosecution claim, however, was improperly dismissed. Jocks claims that Oggeri violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and falsified evidence against him. *Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983. *See Deshawn E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998). The appropriate remedy for violations of *Miranda* rights is exclusion of the evidence at trial. *Id.* Although Jocks argues that there was coercion, evidence of coercion is absent. In particular, making provocative statements in front of a suspect who has insisted on having his lawyer present and asking if the statements are accurate is simply a run-of-the-mill *Miranda* violation, which can taint the evidence but is not independently actionable as a civil rights claim.

However, the trial court, in dismissing the malicious prosecution claim against Oggeri, rejected the argument that the fabrication of evidence is a civil rights violation. In so doing, the district court erred. We have held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he, violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti,* 124 F.3d at 130. Oggeri asserts that *Ricciuti* only applies to false evidence created to justify an arrest without probable cause, but in *Ricciuti* we specifically held that the police had probable cause to arrest but nonetheless reversed the district court's grant of sum-

mary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence. *Id.* at 128, 130.

■■■■ Jocks testified that the statement written by Oggeri was false; that it had been edited to favor the police; and that for that reason he refused to sign the statement after Oggeri recorded it. Oggeri testified that the statement was verbatim and accurate, although he did admit that he wrote the statement down fifteen to twenty-five minutes after it had been made. It is undisputed that the statement was passed on to the prosecution. Although there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit Jocks's testimony and reject Oggeri's. Consequently, because judgment as a matter of law should not have been granted in favor of Oggeri, we vacate and remand for a new trial.

### IV. Sanctions

The district court imposed sanctions on New York City for its failure to produce Captain Robert Morgan of the New York Police Department as a witness at the trial. Captain Morgan investigated the incident on behalf of the NYPD to determine whether Tavernier's conduct was proper. Both Jocks and Tavernier intended to call Captain Morgan at trial. On Friday February 25, 2000, Jocks and Tavernier attempted to serve Morgan with subpoenas to appear at the trial, which was scheduled to begin the next business day. The process servers were not permitted past the front desk of the precinct house where Morgan worked, and the subpoenas were not delivered to Morgan by the desk officer. Morgan left for a vacation without having seen the subpoenas. When the court became aware of Morgan's absence the following Wednesday, it ordered Cor-

poration Counsel to find Morgan and have him back to court by the next day. When Morgan did not appear until Thursday afternoon, the district court sanctioned New York City for failing to obey a court order and failing to arrange for Captain Morgan's appearance. The district court ordered New York City to pay $5566.35.

While we appreciate the district court's irritation with Corporation Counsel, we do not think that the sanctions order can be sustained under the court's inherent powers to sanction a party for willful disobedience of an order. The first relevant court order was the Wednesday morning order that Morgan be produced in court by Thursday morning. Corporation Counsel's inability to produce Morgan until Thursday afternoon is insufficient for a finding of contempt, because Corporation Counsel was "reasonably diligent" in carrying out the court's instructions. *See, e.g., EEOC v. Local 638*, 81 F.3d 1162, 1171 (2d Cir.1996). We thus vacate the sanctions order.

## CONCLUSION

We VACATE the judgments against Tavernier and in favor of Oggeri and REMAND for a new trial. We also VACATE the sanctions order against the City.