Robert R. **RUHLMANN**, Plaintiff,

v.

Dr. Kevin **SMITH** and Dr. Diana **Puglisi**, Defendants.

No. 99–CV–0213.

United States District Court, N.D. New York.

June 28, 2004.

Chamberlain, Kaufman & Jones, Attorneys for plaintiff, Albany, NY, Alan S. Kaufman, Esq., of counsel.

O'Connor, O'Connor, Bresee & First, P.C., Attorneys for defendants, Albany, NY, Dennis A. First, Esq., P. Baird Joslin, Esq., of counsel.

## AMENDED MEMORANDUM–DECISION and ORDER [1]

HURD, District Judge.

### I. BACKGROUND

On October 27, 1999, plaintiff Robert Ruhlmann ("plaintiff") filed an amended complaint against Ulster County Department of Social Services ("DSS"), Ulster County Department of Mental Health ("DMH"), Marshall Beckman ("Beckman"), Ernest Townsend ("Townsend"), Benedic-

---

1. This decision makes technical changes to the Memorandum–Decision and Order dated June 17, 2004, with respect to the *Marion* case, but in no way alters the analysis and conclusions reached in that decision. (Dock- et No. 213.) Accordingly, the notice plaintiff submitted following the decision accepting a reduced compensatory damages award remains valid and is still accepted.

tine Hospital, Ruth McGregor ("McGregor"), Dr. Joel Ginsberg ("Ginsberg"), Dr. David Steres ("Steres"), Dr. Kevin Smith ("Smith"), and Dr. Diana Puglisi ("Puglisi"), alleging: (1) as against all defendants, constitutional claims of false arrest and false imprisonment, pursuant to 42 U.S.C. § 1983, (2) as against DSS, disability discrimination in violation of the Americans With Disabilities Act and the New York Executive Law, (3) as against Benedictine Hospital, McGregor, Steres, Ginsberg, Smith and Puglisi, medical malpractice in violation of state common law, and (4) improper denial of access to and disclosure of clinical records, in violation of Mental Hygiene Law §§ 33.13, 33.16. (Docket No. 29.) With the exception of the disability discrimination claims, all the claims arose out of the involuntary pick-up—purportedly pursuant to Mental Hygiene Law § 9.45—and subsequent confinement—purportedly pursuant to Mental Hygiene Law § 9.39—of plaintiff in the mental health unit of Benedictine Hospital.

Pursuant to a Memorandum–Decision and Order dated November 26, 2002, plaintiff's disability discrimination claim under the ADA was dismissed with prejudice, but all other claims survived summary judgment. *Ruhlmann v. Ulster County Dep't of Soc. Servs.*, 234 F.Supp.2d 140 (N.D.N.Y.2002) ("*Ruhlmann I*"). Familiarity with that decision, which extensively outlines the factual contentions of this case, *id.* at 144–57, will be assumed.

In April 2003, plaintiff entered into stipulations of settlement and proposed dismissals with two sets of defendants. The first set was comprised of defendants DSS, DMH, Beckman, and Townsend ("the County defendants"), and the second set was comprised of defendants Benedictine

Hospital, McGregor, Ginsberg, and Steres ("the Hospital defendants"). The agreements provided that the County defendants and the Hospital defendants would each pay plaintiff the sum of $100,000 in exchange for the dismissal of all claims against them. No similar agreement was entered into between plaintiff and defendants Smith and Puglisi.

By Order dated May 12, 2003, the parties were given until May 23, 2003, to submit any objections to the proposed dismissal of plaintiff's claims against the County defendants and/or the Hospital defendants. (Docket No. 131.) No such objections—neither by defendants Smith and Puglisi, nor by any other party—were received by the specified date. Accordingly, on May 30, 2003, the stipulations of settlement and proposed dismissals of plaintiff's claims against the County defendants and the Hospital defendants were accepted. (Docket No. 158.)

Jury selection commenced on March 23, 2004, for plaintiff's remaining claims—unconstitutional false arrest and false imprisonment asserted under § 1983, common law medical malpractice, and failure to give access to and improper disclosure of medical records—against Smith and Puglisi. An eight-day jury trial followed. After the close of the evidence and prior to the jury being given its deliberation instructions, however, the temporal distinction between the false arrest claim—which involved events prior to and including the involuntary pick-up—and the false imprisonment claim—which involved the involuntary admission to and confinement in Benedictine Hospital—compelled the dismissal of the former against both Smith and Puglisi, since neither participated to any significant degree in the decision to issue the involuntary pick-up order.[2] The remain-

**2.** Plaintiff's claims for denial of access to and improper disclosure of his medical records were also dismissed.

ing claims of false imprisonment and medical malpractice were submitted to the jury.

On April 2, 2004, the jury was given instructions and a verdict form. On the verdict form were sixteen questions. The first eight questions related to the federal constitutional false imprisonment claims, and asked, *inter alia*, whether the jury unanimously agreed that Smith and Puglisi acted under color of state law. The next four questions related to the state medical malpractice claim, and asked, in sum, whether both Smith and Puglisi failed to act in conformity with the generally accepted standards in the medical community in admitting and confining plaintiff in Benedictine pursuant to Mental Hygiene Law § 9.39. The remaining questions, including a "Yes" or "No" question for each defendant as to whether plaintiff was entitled to punitive damages, concerned damages.

On April 5, 2004, the jury returned a verdict in favor of plaintiff on all claims against both Smith and Puglisi. It awarded plaintiff $1 million in compensatory damages, and answered in the affirmative that he was entitled to punitive damages against Smith, but in the negative as to the same against Puglisi. On April 27, 2004, after a one-day trial, the jury awarded plaintiff $75,000 in punitive damages against Smith.

On May 12, 2004, Smith and Puglisi moved, pursuant to Fed.R.Civ.P. 50(b), 50(c), and 59(a), for judgment as a matter of law, a new trial or a remittitur with respect to compensatory damages, and also asked that the $1 million compensatory damages award be offset by the $200,000 plaintiff received as a result of the settlements with the County defendants and the Hospital defendants. (Docket Nos. 204–06, 211.) Plaintiff opposed. (Docket Nos. 207–10.)

Oral argument was heard on June 11, 2004, in Utica, New York. Decision was reserved.

## II. DISCUSSION

While the primary points of contention between the parties concern the amount of compensatory damages awarded by the jury, a brief mention of the jury's findings with respect to liability is appropriate, as defendants have raised the same.

### A. Liability

In motions made pursuant to Fed. R.Civ.P. 50, "the question is always whether, after drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003). In other words, the motion will meet success "only if there is such a complete absence of evidence supporting the verdict [such] that the jury's findings could only have been the result of sheer surmise and conjecture, or [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108 (2d Cir.2001) (internal quotations and citation omitted).

■ Unlike a motion pursuant to Fed. R.Civ.P. 50, a motion for a new trial under Fed.R.Civ.P. 59 may be granted even if the court, which does not have to view the evidence in the light most favorably to the non-moving party, determines that substantial evidence supports the verdict. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir.1998); *see also Gonzalez v. Bratton*, 147 F.Supp.2d 180, 189 (S.D.N.Y.2001) ("The standard governing a motion for a new trial under Fed.

R.Civ.P. 59 involves more judicial discretion than does a motion for judgment as a matter of law"). However, because a Rule 59 motion may only be granted where the jury's verdict is "egregious," "a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134. Under both of these standards, the jury's findings with respect to Smith's and Puglisi's liability cannot be overturned.

■ There can be little question that it was not unreasonable for the jury to find that both defendants falsely imprisoned plaintiff, and engaged in conduct that fell below the standard of care in admitting and confining plaintiff pursuant to the mandates of Mental Hygiene Law § 9.39. With respect to the false imprisonment claims asserted under § 1983, the jury was instructed—and both parties agreed—that the only substantive element at issue was whether plaintiff's involuntary confinement in Benedictine Hospital was privileged. Whether the confinement here was privileged depended upon whether the mandates of Mental Hygiene Law § 9.39 had been fulfilled. As noted in *Ruhlmann I*, at the summary judgment stage several questions of fact had been raised as to defendants' compliance with that statutory section, including but not limited to whether proper mental and physical examinations of plaintiff had been conducted, whether he exhibited any symptoms or gave any indications of dangerousness, and whether such dangerousness was of such a substantial degree that he could not be released under the law. Testimony and other evidence were presented by both sides on these questions, and the jury was fully entitled to resolve them in favor of plaintiff. Its conclusions in that regard cannot and will not be disturbed.

For example, the testimony at trial could have reasonably supported a finding that Puglisi, upon examining plaintiff, initially believed that he could be released, but changed her mind upon speaking with Smith, who had not examined plaintiff[3] but who had been in contact with Townsend, who it could have been found from the evidence exerted pressure upon Smith to keep plaintiff confined. The evidence adduced at trial could have reasonably supported a finding that defendants did not engage in reasonable efforts to corroborate the alleged threat made by plaintiff, which came to defendants' attention, it should be noted, through multiple levels of hearsay.

The evidence also reasonably supported the finding that defendants' conduct was intentional or reckless, which requirement of culpability was made explicit to the jury on the verdict form. The jury was entitled to believe that defendants' conduct went beyond the merely unreasonable, and was instead taken intentionally or recklessly in disregard of the known consequences of admitting plaintiff despite the circumstances not indicating that Section 9.39 was fulfilled.[4]

Likewise, with respect to the medical malpractice claim, the testimony and evidence presented at trial could reasonably have supported the jury's finding on liabili-

---

3. In fact, Dr. Smith *never* examined or even spoke to plaintiff.

4. Because the jury's finding that Smith and Puglisi acted *intentionally* and/or *recklessly* is reasonably supported by the evidence, its finding with respect to qualified immunity— i.e., that they acted *unreasonably* in light of plaintiff's right to be free from false imprisonment—also cannot be disturbed. Even if Smith and Puglisi were entitled to such immunity as a matter of law, based on the evidence presented, it would not relieve them of liability on plaintiff's medical malpractice claim, which offers no such protection.

ty. Section 9.39 also provided guidance on this claim. Particularly, the jury was charged with determining the generally accepted medical standards for confining an individual pursuant to Section 9.39, and then whether Smith and Puglisi fell below that standard. In other words, while the jury had to determine whether their conduct under the false imprisonment claim was reckless and intentional, it needed to determine only whether it was negligent under the medical malpractice claim. As noted, factual questions were aplenty, and the resolution of the same either way was not so unreasonable as to sustain defendants' burden under Rule 50 or Rule 59.

Defendants also claim that the jury's finding that they acted under color of state law is not reasonably supported by the evidence. Particularly, the jury was asked, in separate questions, whether Smith and Puglisi were "coerced, or significantly encouraged or compelled, by county or city officials or other persons acting under color of state law." (Court's Ex. 1, Questions 1, 5.) For example, the evidence adduced at trial reasonably supported a finding that Smith acted under the influence or coercion of county officials, with whom he was in telephonic contact on more than one occasion. The jury could have found, from the evidence presented, that he, under this influence or coercion, exerted his own influence or coercion in instructing other Benedictine employees, including Puglisi,

to ensure plaintiff's admission, purportedly under Section 9.39.[5]

Moreover, even if defendants did not, as a matter of law, act under color of state law, liability may still be predicated on the jury's finding with respect to the medical malpractice claim, which does not require plaintiff to demonstrate that county officials or others acting under color of state law "coerced, or significantly encouraged or compelled" Smith's and Puglisi's conduct.

Thus, the evidence presented at trial fully supports the jury's findings, in all respects, as to the liability of Smith and Puglisi.

## B. *Compensatory Damages*

Defendants contend, more prominently, that the $1 million compensatory damages award was excessive and should be reduced, and that it should be offset by $200,000, the aggregate amount for which plaintiff settled his claims against the County defendants and Hospital defendants. All three issues will be addressed.

### 1. *Excessiveness of Verdict*

When a defendant contests the size of an actual damages award, the operative question is "whether the award is so high as to shock the judicial conscience and constitute a denial of justice."[6] *Mathie v. Fries,* 121 F.3d 808, 813 (2d Cir.1997) (internal quotations and citation omitted); *see also*

---

5. To the extent that the issue of whether one acted under color of state law is a question of law exclusively reserved for the court, the jury's findings as to the state actor questions on the verdict form are viewed as advisory and are hereby adopted, based on the evidence presented at trial.

6. Under New York law, which would apply to plaintiff's medical malpractice claim, a damages award is excessive if it "deviates materially from what would be reasonable compensation," as informed by verdicts in similar

cases. *See Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 423, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Rangolan v. County of Nassau,* available at 370 F.3d 239, 244 (2d Cir.2004) (quoting N.Y. C.P.L.R. § 5501(c) (McKinney 1995)). Because, however, the $1 million compensatory damages award is excessive even under the more stringent "shock the judicial conscience" standard, it need not be decided which standard must be used in assessing the verdict here.

*Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 165 (2d Cir.1998) (district court may compel choice between reduced verdict and new trial on damages "where the award is intrinsically excessive in the sense of being greater than a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error") (internal quotations and citation omitted). While in answering this question comparable cases should provide guidance, a district court is not to "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." *Ismail v. Cohen,* 899 F.2d 183, 187 (2d Cir.1990). Likewise, "[t]here is not a requirement that the court uphold the jury's award so long as it does not exceed the highest amount awarded in a similar case in that state." *Rodick v. City of Schenectady,* 856 F.Supp. 105, 109 (N.D.N.Y.1994). Further, "when considering the sizes of awards in earlier cases, we must take into account inflation, as the reasonable range for [plaintiff's] injuries today is higher than it would have been ten years ago." *DiSorbo v. Hoy,* 343 F.3d 172, 185 (2d Cir.2003).

As proof that the jury's $1 million award is excessive, defendants direct attention to *Gardner v. Federated Dep't Stores, Inc.,* 907 F.2d 1348 (2d Cir.1990); *Marion v. LaFargue,* No. 00 Civ. 840, available at 2004 WL 330239 (S.D.N.Y. Feb.23, 2004); *Dick v. Watonwan County,* 562 F.Supp. 1083 (D.Minn.1983); and *Barker v. Netcare Corp.,* 147 Ohio App.3d 1, 768 N.E.2d 698 (2001). In addition to *Marion* and *Dick,* plaintiff points to three other cases cited within *Marion, Wagenmann v. Adams,* 829 F.2d 196 (1st Cir.1987); *Kennedy v. Sams,* 1997 WL 33100527; and *Lund v. N.W. Med. Ctr.,* as "the most closely analogous to the facts and injuries in this case." (Docket No. 209, p. 8.)

The relevance and comparability of *Kennedy* and *Lund* are questionable. According to the court in *Marion,* the plaintiff in *Kennedy* was a doctor who, after vehemently complaining to the mental health institution in which her aunt was housed and treated, was deceived into visiting the facility and involuntarily committed as a danger to herself and/or others. The plaintiff sued, claiming emotional distress and mental anguish for wrongful imprisonment. After three hours of deliberation, a jury awarded her $2.925 million in compensatory damages.

All of this information, however, comes from 1997 WL 33100527, which is no more than a summary of the reported verdict. No judicial opinion was rendered on whether the verdict was excessive and, in fact, according to an "Editor's Note" at the bottom of the cited document, the parties settled for $1 million after the verdict was rendered. While plaintiff claims that it is the verdicts actually rendered by the jury, and not any verdict that was reduced or otherwise assessed by a court, that are relevant, it would be nonsensical to consider only verdicts that were later determined to be unlawful, or verdicts devoid of scrutiny altogether, in determining whether the award here was excessive.

Likewise, the court in *Marion* considered *Lund* based on a complaint and verdict sheet from the case that was submitted to it by counsel. According to *Marion,* the plaintiff in that case was involuntarily committed to a mental institution for six and a half days after his wife informed the police that he was threatening to kill her. The jury awarded the plaintiff $750,000 in compensatory damages. However, unlike the attorneys in *Marion,* plaintiff has submitted no materials from *Lund* that would allow analysis and a determination of its applicability to *this* case. With nothing more than its brief mention in *Marion,* in

which the facts are scarcely mentioned, it cannot be said here that the case is even comparable.

It should also be noted that the court in *Marion* did not place great or even appreciable reliance on either case in making the excessiveness determination. Therefore, like *Marion*, it is here determined that while *Kennedy* and *Lund* are both worthy of brief mention, neither need be discussed in great detail, and reliance will be focused upon the cited cases that were the subject of more exacting judicial scrutiny, in opinions where comparability and applicability to the instant case can be effected in a more precise and, indeed, proper manner.

In *Gardner*, the Second Circuit was confronted with, *inter alia,* a $150,000 award for deprivation of liberty, and a $150,000 award for pain and suffering, arising out of a roughly half-day involuntary confinement of the plaintiff. The court was careful to note that the former was intended to compensate plaintiff for "the denial of free movement and the violation done to [plaintiff's] dignity as a result of the unlawful detention," while the latter was intended to redress the "physical and mental injuries arising from the incident." *Gardner,* 907 F.2d at 1353. While upholding the award for pain and suffering, the court found excessive the $150,000 award for deprivation of liberty, holding that a new trial on that portion of the damages award must be given unless the plaintiff agreed to a $100,000 reduction. *See also Bender v. City of New York,* 78 F.3d 787, 792 (2d Cir.1996) (reducing a $300,000 award to $150,000 where physical injuries were minor, unlawful detention lasted 24 hours, and emotional damages were minimal).

In *Marion,* the plaintiff, who undisputedly had a serious mental illness, was involuntarily committed to the psychiatric ward of a hospital for six days pursuant to Mental Hygiene Law § 9.39. He later sued and was awarded $750,000 in actual damages for the improper confinement. The court, after an extensive review of other allegedly comparable cases, held that the maximum amount which the plaintiff could have been awarded for six days of deprivation was $150,000. Though it is difficult to determine precisely upon which factors the court based this figure, it did point out that the fact that plaintiff immediately received notice of her legal rights and status, which the court deemed "comforting knowledge that he would have an attorney and a court hearing," and the fact that he apparently was observed interacting well with other patients, diminished or rendered less believable his allegations that the confinement was "total terror." *Marion, supra,* at *12.

In *Dick,* two parents filed suit under § 1983 after they were both involuntarily committed to a detoxification center for roughly four days based on uncorroborated information given to local government officials by their 15 year-old daughter. 562 F.Supp. 1083, *rev'd against one defendant,* 738 F.2d 939 (8th Cir.1984). A jury awarded each plaintiff $500,000 in actual damages, and defendants filed a motion contending the same was excessive. Significantly, in light of the damages in the case being "largely intangible and extremely difficult to measure with any precision," the court rejected the notion that the size of the verdict alone signified passion and prejudice and was therefore excessive. *Id.* at 1107–08. It did, however, find the award to be excessive. Specifically, while acknowledging that being involuntarily confined without cause for three days was "serious harm," and that the right to be free from false imprisonment is "among the most fundamental of all civil rights," the court determined that the maximum amount a jury could reasonably have awarded was $125,000 to each plain-

tiff. *Id.* at 1108. The reason or reasons for such a finding are not immediately clear from the opinion.

In *Barker*, one of the plaintiffs was medicated and physically restrained against her will for what appears to be roughly half of a day. The matter came to trial on claims of intentional infliction of emotional distress and false imprisonment. The jury found that the confinement was not privileged, and awarded $50,000 in compensatory damages. Based on the emotional distress and rather minor physical injuries suffered by plaintiff, the court held that the award was not excessive.

In *Wagenmann*, the plaintiff was stopped and arrested based on uncorroborated, double and triple hearsay information that he intended to shoot and blow up the home of a prominent family whose son was to marry his daughter, from whom he had been estranged due to his religious beliefs on premarital cohabitation and interaction. After the contents of his car were thrown onto the road and he was issued a citation for driving without a registration—a claim which turned out to be false, as the documentation was in the glove compartment—the plaintiff was transported to jail and then, upon the coerced recommendation of a court-appointed psychiatrist, involuntarily committed to the mental health unit of a State hospital. There he stayed despite the contrary opinion of every professional who evaluated him, until the Chief Judge for the jurisdiction ordered him released and dropped all criminal charges.

A jury awarded the plaintiff approximately $1.6 million, $250,000 of which was intended to redress the wrong done to him by the 36–hour false imprisonment. Plain-

tiff thereafter accepted a reduced verdict of $50,000 on the false imprisonment claim. The First Circuit Court of Appeals agreed that the original verdict was "outsized," but found that the reduction from $250,000 to $50,000 for the confinement brought the award "within the proper realm." *Wagenmann*, 829 F.2d at 216.

Adjusting only for inflation results in the following present-day values of the verdicts in the above cases: (1) the $200,000 verdict in 1990 in *Gardner* translates to a verdict of $281,600 in 2003; (2) the $150,000 verdict for six days of confinement in 2003 in *Marion* requires no translation, as the decision was rendered in February 2004; (3) the $125,000 verdict in 1983 in *Dick* translates to a $230,875 verdict in 2003; (4) the $50,000 verdict in 2001 in *Barker* translates to a $51,950 verdict in 2003; and (5) the $50,000 verdict in 1986 in *Wagenmann* translates to a $83,950 verdict in 2003.[7] Thus, the range of actual damages from these cases, with an adjustment for inflation but without adjustment for any other factor, would be $51,950 to $250,000. The average of the verdicts—after inflation adjustment—is $159,675.

The range and average significantly change, however, when the verdicts are also adjusted to take into account the length of improper confinement. The verdicts in *Gardner*, *Barker*, and *Wagenmann*, for example, were rendered in cases involving shorter confinement than was the case here, while the verdict in *Marion* redressed a longer confinement period. The confinement in *Dick* was roughly equivalent to that endured by plaintiff in the instant case. While it is admittedly impossible to determine whether a jury would view the first minute, hour,

---

**7.** For all calculations, including those adjustments made for length of confinement, *infra*, NASA's Consumer Price Index Inflation Calculator was utilized, http://www.jsc.nasa.gov/bu2/inflateC-PI.html. 2003 is the most recent available year to which a figure can be inflated.

or day of confinement as warranting more compensation than the last minute, hour, or day of confinement, the following would represent the present-day value of the verdicts in the above cases when adjusted strictly for inflation *and* length of confinement: (1) the $200,000 verdict in 1990 for the half day of confinement in *Gardner* would translate to a $2.25 million verdict for four days of confinement in 2003; [8] (2) the $150,000 verdict in 2004 for the six days of confinement in *Marion* would translate to a $100,000 verdict for four days of confinement in 2003; [9] (3) the $125,000 verdict in 1983 for four days of confinement in *Dick* would translate to a $230,875 verdict for four days of confinement in 2003; [10] (4) the $50,000 verdict in 2001 for the half day of confinement in *Barker* would translate to a $415,600 verdict for four days of confinement in 2003; [11] and (5) the $50,000 verdict in 1986 for a day and a half of confinement in *Wagenmann* would translate to a $223,864 verdict for four days of confinement in 2003.[12]

Thus, when adjusted for both inflation and length of confinement, the range of compensatory damages from these five cases is $100,000 to $2.25 million. To the extent that *Gardner* can be considered a statistical outlier—because the amount awarded therein, as adjusted, exceeds 500% of the next lowest award, as adjusted—the range is $100,000 to $415,600. The average of the verdicts—after adjustment for inflation and length of confinement, and exclusion of *Gardner*—is $242,584.75. Including *Gardner*, the average is increased to $644,627.80, which is well above the adjusted verdict in every other case, but still roughly 36% less than plaintiff was awarded here.

■ Thus, regardless of whether adjusting for length of confinement is an appropriate practice—and it is here opined that it probably is, in some fashion—it is clear that the $1 million compensatory damages award in this case is excessive when compared to the other cases which defendants and plaintiff agree are most comparable to the instant one. While the distinguishing factual features of these cases will have some impact on the amount the award is reduced, *infra*, they are not so glaring as to change the fundamental conclusion that the $1 million award is excessive.

### 2. *Remedy for Excessive Verdict*

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the

---

8. The calculation assumes that, had the plaintiff in *Gardner* been confined for a full day, $400,000 would have been awarded in actual damages. $400,000 multiplied by four days is equivalent to $1.6 million. $1.6 million in 1990 is equivalent to $2,252,800 in 2003.

9. The calculation assumes that the $150,000 verdict is evenly distributed for all six days of confinement, for a per-day confinement value of $25,000. Because *Marion* was decided in 2004, there is no need to adjust for inflation. Thus, $25,000 multiplied by four days is equivalent to $100,000.

10. The simplest calculation, the $125,000 is only adjusted for inflation, since the length of confinement in *Dick* and the instant case is equivalent.

11. This calculation assumes that, had the plaintiff in *Barker* been confined for a full day, $100,000 would have been awarded in actual damages, $100,000 multiplied by four days is equivalent to $400,000. $400,000 in 2001 is equivalent to $415,600 in 2003.

12. This calculation assumes that the $50,000 verdict is evenly spread over a day and a half, resulting in a per-day award of $33,333. $33,333 multiplied by four days is equivalent to $133,332. $133,332 in 1986 is equivalent to $223,864.

plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.... A reduced award should represent the maximum award that would not be excessive." *Noga v. Potenza,* 221 F.Supp.2d 345, 351 (N.D.N.Y.2002) (internal quotations and citations omitted); *see also Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328–30 (2d Cir.1990) (discussing methods of remittitur calculation and adopting the "maximum award" approach in Jones Act case as "least intrusive" to jury's dominion); *Rangolan, supra* note 5, at 244 (using "maximum award" approach in analyzing reduced verdict on state claim).

■ While the distinguishing features of the comparable cases were not enough to undermine the otherwise clear conclusion that the $1 million award was excessive, they do become relevant in setting the reduced damages award under remittitur, which plaintiff has the option of accepting or proceeding to a new trial on damages only. For example, the plaintiff in *Gardner,* unlike plaintiff here, suffered physical abuse and was tossed in a jail cell and taunted by other prisoners. On the other hand, his confinement does not appear to have lasted more than half of a day, and he appeared to be well aware of why he was being confined (i.e., he was expressly accused of theft from the store), whereas plaintiff here was confined for four days and testified at trial that he was never informed of the precise reasons.

In *Marion,* a reason given for reducing any portion of the award based on the stigmatizing effect the confinement in a mental health unit would have on the plaintiff was the undisputed fact that he had a severe mental illness that was well known. Plaintiff here had been previously diagnosed with bipolar disorder, and there was no evidence he suffered from the same apocalyptic hallucinations as the plaintiff in *Marion.* Furthermore, the court in *Marion* also reduced the award on the basis that the "comforting knowledge" given to plaintiff by being made aware of his legal rights diminished or lessened the emotional damages he may have incurred being locked up unlawfully in a mental health unit. Here, whether plaintiff was given his rights in accordance with the Mental Hygiene Law was expressly identified as a question of fact in *Ruhlmann I.* The jury, however, was not required to specifically answer it on the verdict form.

In *Dick,* the information used as a basis for the decision to involuntarily commit the plaintiffs, though uncorroborated, came from the plaintiffs' daughter and was purportedly based on events in which she was a participant or witness. Here, the information used to involuntarily pick-up and confine plaintiff was uncorroborated hearsay, and appeared to take a more ghastly and evil form as the information progressed from one level to another. As noted, it is difficult to determine the comparability of *Dick* in light of the fact that the court did not specify its reasons for reducing the award.

In *Barker,* the plaintiff was initially confined after police officers found her crawling on a sidewalk and acting irrationally. She was confined for half of one day. Plaintiff here was arrested and confined for four days based on uncorroborated information that he made a threat days earlier. He was washing the floors of his home when he was arrested and thereafter confined. Further, it should be noted that the court in Barker was affirming the trial court's determination that $50,000 represented a reasonable verdict. It did not have occasion to determine whether any

amount greater than $50,000 would also have been reasonable.

Likewise, in *Wagenmann*, the First Circuit affirmed the district court's reduction of the $250,000 award to $50,000. Importantly, the plaintiff in that case accepted the reduced verdict and did not challenge it on appeal. Thus, though the First Circuit did state that the overall verdict, which was $1.6 million, was "outsized," it did not specifically address the false imprisonment portion ($250,000) or, even assuming it was therein encompassed, state that an amount less than $250,000 but more than $50,000 would not have been reasonable. Moreover, the plaintiff in *Wagenmann*, though suffering a horrific ordeal, was improperly confined for 36 hours. Plaintiff here was improperly confined for four days.

As the court in *Dick* recognized, it is difficult to precisely quantify damages for emotional distress, mental anguish, and mental pain and suffering, because such concepts are abstract and ill-suited to exacting calculation. A lower amount than that awarded in *Gardner* is justified because plaintiff here did not suffer physical abuse and was confined in a hospital, not a jail cell, where he was not freely taunted and otherwise abused by other prisoners. The length of confinement mandates that the award here exceed that awarded in *Barker*, in addition to the much flimsier basis on which defendants had to initially confine plaintiff. Likewise, it appears that a sturdier informational foundation underscored the confinement in *Dick*, where the allegations came directly from the mouth of a person who had witnessed *numerous* alleged episodes, as opposed to the instant case, where the information received by defendants was at least double hearsay and concerned one alleged comment made on one day. The instant case is closely analogous to *Wagenmann*, in that uncor-

roborated, multiple levels of hearsay prompted the confinement, but different in that the plaintiff in that case was released after 36 hours, whereas plaintiff here was confined for four days.

An award greater than that awarded in *Marion* is also justified. The plaintiff in that case had a well known and serious mental illness, thereby reducing any stigmatizing effect the confinement had on him, according to the court. Here, plaintiff indeed had been previously diagnosed with bipolar disorder, but no evidence was presented that this fact was advertised prior to the events in question. The plaintiff in *Marion* also was made aware of his rights to legal representation and a day in court, thereby, according to the court, providing him with some level of comfort to offset the trauma inflicted by the improper confinement. Here, plaintiff claimed he was not made aware of his rights and, in fact, that he was never even sufficiently informed why he was being confined. He also claimed that he was contemplating escape—clearly, his confinement was not occasioned by any comfort.

On a more practical level, based on the facts and circumstances of this case, it is here found that involuntary confinement in the mental health unit of a hospital for four days, without ever being informed of the basis for such confinement, where the staff concludes that release is proper but then changes its mind without any new information, and where little effort is made to corroborate the alleged information justifying the confinement, is, strictly speaking, worth more than $100,000 or even $150,000.

Based upon the comparable cases as well as the facts and circumstances of this case, it is here found that a compensatory damages award of $450,000 is the maximum amount within the realm of reasonableness for the mental and emo-

tional injuries plaintiff suffered while illegally confined for four days in the mental health unit of Benedictine Hospital. It would have been reasonable for a jury to award that amount at a maximum.

Plaintiff has the option of accepting this reduced amount or a new trial solely on the issue of compensatory damages. Any passion or prejudice on the part of the jury does not rise to the level where a new trial altogether is warranted, especially in light of the substantial evidence of liability, *see supra.*

### 3. *Set-off of Settlements*

■ Defendants also argue that the compensatory damages award should be offset by the $200,000 plaintiff received through settlements with the County defendants and Hospital defendants. Regardless of the method used to calculate any set-off, it is beyond dispute that any reduction of an award based on settlement is only proper where "the settlement and the judgment represent common damages." *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 600 (2d Cir.1989); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litigation,* 957 F.2d 1020, 1030 (2d Cir.1992) ( after discussing three methods of set-off calculation,[13] stating, "*Singer* makes two points.... Second, where a settlement and judgment compensate a plaintiff for the same injury, a non-settling defendant is entitled to a judgment reduction at least in the amount of a prior settlement").

■ Defendants do not dispute that, as the parties asserting that set-off is appropriate, they bear the burden of proof. It can only be said that such burden has been partially discharged. As noted, a temporal

distinction was drawn between plaintiff's involuntary pick-up, which formed the basis of his false arrest claim, and his subsequent admission to and confinement in Benedictine Hospital, which formed the basis of his false imprisonment claim and was the subject of the trial in this case. It cannot be disputed that nearly all of the Hospital defendants, who settled all claims against plaintiff for $100,000, were parties only to plaintiff's admission and confinement in the hospital. Only defendant McGregor was involved in the involuntary pick-up as well.

The County defendants were all involved in the involuntary pick-up, but plaintiff also claimed that they were the coercive and guiding force behind plaintiff's involuntary admission to and confinement in the hospital. Indeed, in finding that defendant Smith acted under color of state law, the jury had to have found as much. However, the stipulation of settlement and dismissal do not specify for which of plaintiff's claims the $100,000 applies. The same is true with respect to any role McGregor may have had in the involuntary pick-up.

Nevertheless, with the certainty that all but one of the settling Hospital defendants were only involved—albeit on a more minor basis—in the involuntary admission and confinement, and that the jury found Smith was significantly encouraged or coerced by a County defendant, it is appropriate to set-off a significant portion of the $200,000, on the grounds of equity, as offsetting a jury award based on amounts received in settlement is just such a remedy.

■ It takes no endeavor in apportioning fault to realize that Steres, Ginsberg,

---

**13.** The three methods identified and described in detail by the Second Circuit are the *pro rata* method, and proportionate fault

method, and the *pro tanto* method. *Masters Mates,* 957 F.2d at 1028–1030.

and Benedictine Hospital were considered by plaintiff to play lesser roles in his whole ordeal, from pick-up to eventual release, and that McGregor, who was involved in the pick-up and the initial stages of admission and confinement, played a somewhat larger role. This, coupled with the fact that at least some of the County defendants were found by the jury to have been involved in the admission and confinement, compels by equity that the actual damages award be set-off by $125,000. A greater set-off is inappropriate because of the lack of definitive proof offered by defendants. A lesser set-off is inappropriate because of the certainty that most of the settling defendants were involved—some perhaps intimately—in the claims for which the jury rendered its verdict at trial.

### C. *Punitive Damages*

Defendants also argue that the $75,000 in punitive damages awarded by the jury should be set aside as a matter of law pursuant to Fed.R.Civ.P. 50(b). As noted, when considering motions under Rule 50, "the question is always whether, after drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor." *Jocks*, 316 F.3d at 134.

■ It is proper for a jury to award punitive damages in a Section 1983 action " 'when the defendant's conduct ... involves reckless or callous indifference to the federally protected rights of others.' " *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir.1997) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Taking the evidence in the light most favorable to plaintiff, *see supra*, it cannot be said as a matter of law that plaintiff was not entitled to punitive damages against Smith.[14]

### III. *CONCLUSION*

Whether viewed under Rule 50 or Rule 59, the jury's findings with respect to liability cannot be upset in this case. It's compensatory damages award, however, is excessive when viewed in light of evidence presented at trial and in light of verdicts rendered in comparable cases. The maximum award that would be within reason, considering such facts and circumstances and comparable cases, is $450,000. Defendants are additionally entitled to a set-off of the compensatory damages award in the amount of $125,000, as such amount equitably represents the amount of damages common to the settlements and the jury verdict.

Accordingly, it is

ORDERED that

---

14. Defendants dispute this point in their reply papers, stating that "[p]laintiff's supposed evidence supporting punitive damages is based on nothing more than surmise and conjecture, even looking at the evidence in the light most favorable to the plaintiff." (Docket No. 211, Attach. 1, p. 8.) The same principle can be applied to the arguments set forth by defendants—which essentially boil down to conclusory statements on contested issues of fact that the jury was free to accept or reject— who bear the heavy burden of proof.

Likewise, defendants have not carried their burden in demonstrating that the $75,000 award is excessive. Specifically, their entire argument in this regard is one sentence at the end of the punitive damages section of their memorandum of law, devoid even of citation, that the award is excessive. Such is insufficient and provides no grounds upon which to upset the award. Even if defendants had properly briefed the issue, it is doubtful that a reduction would have been appropriate, as Smith's conduct could have been found to be sufficiently reprehensible, the award bears a reasonable relationship to the compensatory damages award (both before and after remittitur), and no immediately located comparable cases demonstrate that the award is unreasonable.

1. Defendants' motion for judgment as a matter of law is DENIED;

2. Defendants' motion for a new trial is DENIED;

3. Defendants' motion for a new trial on compensatory damages is DENIED unless plaintiff refuses to accept a reduced compensatory damages award in the amount of $450,000, exclusive of the set-off;

4. Defendants' motion for a set-off to the compensatory damages award is GRANTED in the amount of $125,000; and

5. Defendants' motion to set aside the punitive damages award is DENIED.

IT IS SO ORDERED.