11-2846-cv
Swartz v. Insogna

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

Heard: October 2, 2012     Decided: January 3, 2013

Docket No. 11-2846-cv

- - - - - - - - - - - - - - - - - - - - - - - -

John Swartz, Judy Mayton-Swartz,

     Plaintiffs-Appellants,

               v.

Richard Insogna, Kevin Collins,

     Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, LYNCH, and LOHIER, <u>Circuit Judges</u>.

Appeal from the July 8, 2011, judgment of the United States District Court for the Northern District of New York (David N. Hurd, District Judge), dismissing a suit seeking damages for the seizure of two persons ordered to return to an automobile, a disorderly conduct arrest, and an alleged malicious prosecution, all claimed to have been precipitated by an automobile passenger's "giving the finger" to a police officer.

Vacated and remanded.

<div style="margin-left:50%">

Elmer Robert Keach, III, Law Office of Elmer Robert Keach, III, PC, Amsterdam, N.Y., for Appellants.

Catherine Ann Barber, Murphy, Burns, Barber & Murphy, LLP, Albany, N.Y. (Thomas K. Murphy, Murphy, Burns, Barber & Murphy, LLP, Albany, N.Y. on the brief), for Appellees.

</div>

JON O. NEWMAN, Circuit Judge:

An irate automobile passenger's act of "giving the finger," a gesture of insult known for centuries,[1] to a policeman has led to a seizure of two persons ordered to return to an automobile, an arrest for disorderly conduct, a civil rights suit, and now this appeal. Plaintiffs-Appellants John Swartz ("John") and his wife, Judy Mayton-Swartz ("Judy"), appeal the July 8, 2011, judgment of the United States District Court for the Northern District of New York (David N. Hurd, District Judge) granting summary judgment to Defendants-Appellees Richard Insogna, a St. Johnsville, New York, police officer, and Kevin Collins, an officer with the Montgomery, New York, Sheriff's Department.

Accepting, as we must at this stage of the litigation, the Plaintiffs' version of the facts, we vacate the judgment and remand for further proceedings.

Background

In his deposition John gave the following account of the incident. In May 2006, he and Judy were driving through the Village of St. Johnsville on their way to the home of Judy's son. Judy was

---

[1] See Bad Frog Brewery, Inc. v. New York State Liquor Authority, 134 F.3d 87, 91 n.1 (2d Cir. 1998) (reporting the use of the gesture by Diogenes to insult Demosthenes). Even earlier, Strepsiades was portrayed by Aristophanes as extending the middle finger to insult Aristotle. See Aristophanes, The Clouds (W. Arrowsmith, trans., Running Press (1962)). Possibly the first recorded use of the gesture in the United States occurred in 1886 when a joint baseball team photograph of the Boston Beaneaters and the New York Giants showed a Boston pitcher giving the finger to the Giants. See Ira P. Robbins, Digitus Impudicus: The Middle Finger and the Law, 41 U.C. Davis L. Rev. 1403, 1415 (2008).

driving; John was in the passenger seat. At an intersection, John saw a local police officer, Defendant Insogna, in a police car using a radar device, of which John became aware because he had a radar detector. John expressed his displeasure at what the officer was doing by reaching his right arm outside the passenger side window and extending his middle finger over the car's roof. The Plaintiffs, who were not speeding or committing any other traffic violation, continued to the home of Judy's son. Upon reaching their destination on Monroe Street, the Plaintiffs got out of the car and saw a police car with its lights flashing approaching from the corner of the street they were on, ultimately stopping behind Judy's car. When John walked to the trunk of the car, Insogna ordered him and Judy to get back in the car. John initially refused, telling Insogna that he had not been driving the car. Insogna again told John to get back in the car, stating that this was a traffic stop. Judy then urged John to reenter the car, and they both did so.

Insogna then asked to see Judy's license and registration. John then told her not to show the officer anything, prompting Insogna to say, "Shut your mouth, your ass is in enough trouble." Insogna then collected Judy's license and registration, returned to his police car to check the documents, and called for backup. Three other officers soon appeared.

Insogna returned to Judy's car, gave her back the documents, and told the Plaintiffs they could go. John then got out of the car and

asked if he could speak to Insogna, saying "I'd like to speak to you man to man." As he started walking toward Insogna, who was more than 20 feet away, three other officers stepped in front of him. John stopped, walked away from the officers, and said to himself in a voice apparently too low for his words to be understood, "I feel like an ass." One of the other officers asked John what he had said, and John repeated his remark loud enough to be heard. At that point Defendant Collins said, "That does it, you're under arrest," but did not say for what.

John was then handcuffed, placed in a police car, and driven to the police station, where he was given an appearance ticket and released. At the station, he was told he had been arrested for disorderly conduct. Insogna subsequently swore out a complaint, which he filed in the local criminal court, charging Swartz with violation of New York's disorderly conduct statute. Under New York law, such a complaint "[s]erves as a basis . . . for the commencement of a criminal action." N.Y. Crim. Proc. Law § 100.10(1). After he returned home, John retained an attorney. The charge remained pending for several years, during which John made three court appearances. The charge was ultimately dismissed on speedy trial grounds.

The officers gave a different account. In his deposition, Insogna said that after he saw John give him the finger, he decided to follow the car "to initiate a stop on it." As reasons he stated: (1) John's gesture "appeared to me he was trying to get my attention for

-4-

some reason," (2) "I thought that maybe there could be a problem in the car.  I just wanted to assure the safety of the passengers," and (3) "I was concerned for the female driver, if there was a domestic dispute."

Insogna said he followed the car and attempted to have it stop, but it continued to Monroe Street and did not stop until he drove up behind it.  At that point John got out of the car, ran at Insogna, and called him various vulgar names.  After John and Judy got back into their car, Insogna obtained and checked Judy's license and registration, and then called for backup "for my safety."  Other officers arrived.  One of them, Officer Cuddy, approached John in the car and identified himself after John asked who he was.  John started yelling and described Insogna to Cuddy with some of the vulgar terms he had previously used.  After Insogna told John and Judy they were free to go, John got out of the car and told Insogna he wanted to talk to him "man to man."  Insogna told him that would not be a good idea, at which point John walked away shouting that he, John, "felt like an asshole."  At that point, Insogna arrested John.

Collins in his deposition essentially confirmed Insogna's account of the episode preceding the arrest.

The District Court granted the Defendants' motion for summary judgment and dismissed the Plaintiffs' suit.  The District Court, accepting Insogna's third reason for the automobile stop, ruled that the stop was legal because Swartz's "odd and aggressive behavior directed at a police officer created a reasonable suspicion that

Swartz was either engaged in or about to be engaged in criminal activity, such as violence against the driver of the vehicle." The Court next ruled that the Defendants were entitled to qualified immunity on the false arrest claim because "an objectively reasonable officer could have believed that there was probable cause for a disorderly conduct arrest." Finally, the Court ruled that the fact that John had to make three court appearances did not amount to a "post-arraignment seizure," a necessary component of a malicious prosecution claim.

Discussion

I. Legal Standards

This Court reviews de novo a district court's order for summary judgment, see Wachovia Bank, National Association v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011), the standards for which are well settled, see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Wachovia Bank, National Association, 661 F.3d at 171; John Street Leasehold LLC v. FDIC, 196 F.3d 379, 382 (2d Cir. 1999), including the principle, especially pertinent to this appeal, that the facts are to be viewed on appeal in the light most favorable to the non-moving party, see, e.g., Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006). The standards for qualified immunity are also well settled. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal citations and quotation

-6-

marks omitted). "A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity." Okin v. Village of Cornwall-on-Hudson Police Department, 577 F.3d 415, 433 (2d Cir. 2009).

II. Substantive Analysis

The motor vehicle stop. Initially we note that there is a question whether a motor vehicle stop occurred. On a view of the facts favorable to the Plaintiffs, appropriate for assessing the Defendants' motion for summary judgment, Judy stopped the car voluntarily upon arriving at her son's home. Moments later a police car pulled up behind her car. On the Plaintiffs' view of the evidence, the police did not stop the car. They contend they got out of the car after the car had stopped and were then told by Insogna to get back into the car, which they did. The instruction to reenter the car might be considered a component of a motor vehicle stop because in a typical automobile stop occupants would be told to remain in their car. But even if an automobile stop did not occur (although we note that Insogna insists that he did cause Judy's car to stop), the instruction to reenter the car was a sufficient interference with liberty to constitute a Fourth Amendment seizure. See Terry v. Ohio, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); cf. Whren v. United States, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the

-7-

meaning of [the Fourth Amendment].").  An officer "may not lawfully order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity." United States v. Jenkins, 452 F.3d 207, 212 (2d Cir. 2006) (internal quotation marks omitted).

The issue then becomes whether, on the Plaintiffs' version of the facts, Insogna had reasonable suspicion that criminal activity or a traffic violation was afoot.  The only act Insogna had observed prior to the stop that prompted him to initiate the stop was John's giving-the-finger gesture.  Insogna acknowledged in his deposition that he had not observed any indication of a motor vehicle violation.  He stated, somewhat inconsistently, that he thought John "was trying to get my attention for some reason" and that he "was concerned for the female driver."

Perhaps there is a police officer somewhere who would interpret an automobile passenger's giving him the finger as a signal of distress, creating a suspicion that something occurring in the automobile warranted investigation.  And perhaps that interpretation is what prompted Insogna to act, as he claims.  But the nearly universal recognition that this gesture is an insult deprives such an interpretation of reasonableness.  This ancient gesture of insult is not the basis for a reasonable suspicion of a traffic violation or impending criminal activity.  Surely no passenger planning some wrongful conduct toward another occupant of an automobile would call attention to himself by giving the finger to a police officer.  And if there might be an automobile passenger somewhere who will give the

-8-

finger to a police officer as an ill-advised signal for help, it is far more consistent with all citizens' protection against improper police apprehension to leave that highly unlikely signal without a response than to lend judicial approval to the stopping of every vehicle from which a passenger makes that gesture.

On the Plaintiffs' version of the facts, the stop was not lawful, and it was error to grant the Defendants summary judgment on the Plaintiffs' claim concerning the stop. Cf. Sandul v. Larion, 119 F.3d 1250, 1254-57 (6th Cir. 1997) (vacating grant of summary judgment to police officers in suit by automobile passenger arrested for disorderly conduct for shouting obscenity and giving the finger to police officer); Cook v. Board of County Commissioners, 966 F. Supp. 1049, 1052 (D. Kan. 1997) (denying motion to dismiss suit by automobile passenger arrested for disorderly conduct for giving the finger to a group of protesters, which included to police officer). Nor were the Defendants entitled to qualified immunity on this claim because a reasonable police officer would not have believed he was entitled to initiate the law enforcement process in response to giving the finger. Cf. Sandul, 119 F.3d at 1256-57; Cook, 966 F. Supp. at 1052.

The disorderly conduct arrest. On the Plaintiffs' version of the facts, John's conduct preceding his arrest for disorderly conduct consisted only of the followings events. From a distance of more than 20 feet, he stated in a normal voice that he wanted to speak to

Insogna "man to man"; when other officers stood in his way, he retreated and said in a tone too low for his words to be understood by the officers next to him, "I feel like an ass"; in response to an officer's request to repeat what he had said, John did so; Collins then said, "That does it, you're under arrest."

A police officer has probable cause for an arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime," Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996), and is entitled to qualified immunity where he "has an objectively reasonable belief that his actions are lawful," Okin, 577 F.3d at 433.

Even with the wide range of conduct subsumed under New York's expansive definition of disorderly conduct,[2] John's conduct, on the

---

[2] A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
>
> 2. He makes unreasonable noise; or
>
> 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
>
> 4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

Plaintiffs' version of the facts, could not create a reasonable suspicion that a disorderly conduct violation had been or was being committed. Neither Collins, whom John says arrested him, nor Insogna, whose report says he made the arrest, had observed any disruptive conduct, any threatening conduct, any shouting, or anything that risked a public disturbance. Whether or not giving the finger is properly considered an obscene gesture, neither Collins, who had not observed the gesture, nor Insogna, who had observed it and was likely piqued by having seen it, makes any claim on appeal that the gesture was disorderly conduct. Indeed, such a gesture alone cannot establish probable cause to believe a disorderly conduct violation has occurred. "The disorderly conduct statute at issue here does not circumscribe pure speech directed at an individual. Rather, it is directed at words and utterances coupled with an intent to create a risk of public disorder . . . ." People v. Tichenor, 89 N.Y.2d 769, 775 (1997) (citations omitted). On the Plaintiffs' version, probable cause did not exist for an arrest for disorderly conduct. And because an

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law § 240.20.

-11-

objectively reasonable police officer would not have believed that probable cause existed, neither Defendant was entitled to the defense of qualified immunity on a motion for summary judgment.  Of course, the defense of qualified immunity and the lawfulness of the arrest itself will appropriately be in issue at trial, where both versions of the episode will be presented.

The malicious prosecution claim.  The elements of a malicious prosecution claim under section 1983 are derived from applicable state law. See Conway v. Village of Mount Kisco, 750 F.2d 205, 214 (2d Cir. 1984).  We have stated these elements, under New York law, to be (1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice. See Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003); Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997). Additionally, we have said, to be actionable under section 1983 there must be a post-arraignment seizure, the claim being grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures. See Jocks, 316 F.3d at 136.

We have consistently held that a post-arraignment defendant who is "obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required" suffers a Fourth Amendment deprivation of liberty. See Murphy, 118 F.3d at 947; Jocks, 316 F.3d at 136 (concluding that "the requirements of attending criminal proceedings and obeying the conditions of bail" constitute a post-arraignment seizure); Rohman v. New York City Transit Authority, 215 F.3d 208, 215-16 (2d Cir. 2000) (finding Fourth Amendment implicated

-12-

where plaintiff "alleged that he was required, as a condition of his post-arraignment release, to return to court on at least five occasions before the charges against him were ultimately dropped," and where he was obliged by New York statute to "render himself at all times amenable to the orders and processes of the court") (internal quotation marks omitted). When Insogna swore out a complaint against John and filed it in a criminal court, he commenced a criminal action. See N.Y. Crim. Proc. Law §§ 100.05, 100.10. He thus put in motion proceedings that rendered the defendant at all times subject to the orders of the court, see § 510.40(2), and foreseeably required him to incur the expense of a lawyer and the inconvenience and perhaps expense of multiple court appearances.

The District Court relied on dictum in Burg v. Gosselin, 591 F.3d 95, 98 (2d Cir. 2010), to dismiss the malicious prosecution claim. However, there was no claim for malicious prosecution in Burg, see id. at 96 n.3, the plaintiff having sought damages only for the issuance of a summons, see id. at 96. We ruled "that the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." Id. at 98. The plaintiff in Burg was required to appear in court only once. See id. We observed that "the number of [court] appearances may bear upon whether there was a seizure," adding in dictum, however, that "it is hard to see how multiple appearances required by a court, or for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." Id. Burg's dictum is questionable unless the multiple

-13-

appearances were for the arrestee's convenience, but, in any event, we decline to apply that dictum to the different context of a plaintiff who was required to appear in court in connection with criminal proceedings initiated by the defendant police officer.

Dismissal of the claim for malicious prosecution on motion for summary judgment was error.

## Conclusion

We vacate the judgment dismissing all three of the Plaintiffs' claims and remand for further proceedings.