IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-817

 Filed: 20 August 2019

Stanly County, No. 17CRS700160

STATE OF NORTH CAROLINA

 v.

SHAWN PATRICK ELLIS, Defendant.

 Appeal by Defendant from judgment entered 13 March 2018 by Judge Karen

Eady-Williams in Stanly County Superior Court. Heard in the Court of Appeals 27

March 2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General, Kimberly N.
 Callahan, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Michele A.
 Goldman, for the Defendant.

 DILLON, Judge.

 Defendant Shawn Patrick Ellis appeals the trial court’s judgment entered upon

his guilty plea to resisting, delaying, and/or obstructing a public officer during a stop.

Defendant contends that the trial court erred in denying his motion to suppress

evidence. After careful review, we affirm.1

 1 This opinion replaces the opinion that was filed 6 August 2019 and withdrawn by order of
this Court entered 13 August 2019.
 STATE V. ELLIS

 Opinion of the Court

 I. Background

 This case arises from Defendant’s failure to identify himself to a trooper during

a stop. It is a crime in North Carolina for one to refuse to identify himself to a police

officer during a valid stop. See State v. Friend, 237 N.C. App. 490, 768 S.E.2d 146

(2014) (refusing to provide identification during a valid stop may constitute violation

of N.C. Gen. Stat. § 14-223 (2017)).

 The key issue in this case is whether the trooper conducted a valid stop of

Defendant. As reiterated by our Supreme Court just last year, “the Fourth

Amendment permits a police officer to conduct a brief investigatory stop of an

individual based on reasonable suspicion that the individual is engaged in criminal

activity.” See State v. Nicholson, 371 N.C. 284, 288-89, 813 S.E.2d 840, 843 (2018)

(emphasis added). As explained by our Supreme Court, the “reasonable suspicion”

standard required to justify the initiation of a brief, investigatory stop is a low

standard, much lower than the “probable cause” standard necessary to initiate an

actual arrest, and does not require that the officer witness actual criminal behavior:

 The Fourth Amendment permits brief investigative
 stops . . . when a law enforcement officer has “a
 particularized and objective basis for suspecting the
 particular person stopped of criminal activity.” . . . The
 standard takes into account the totality of “the
 circumstances—the whole picture.” Although a mere
 “hunch” does not create reasonable suspicion, the level of
 suspicion the standard requires is “considerably less than

 -2-
 STATE V. ELLIS

 Opinion of the Court

 proof of wrongdoing by a preponderance of the evidence,”
 and “obviously less” than is necessary for probable cause.

Id. at 289, 813 S.E.2d at 843 (quoting Navarette v. California, 572 U.S. 393, 396-97

(2014)).

 Here, the only evidence offered at the suppression hearing was the testimony

of the trooper. Defendant did not testify or offer any evidence to refute the trooper’s

testimony. The trooper essentially testified that, while standing on the side of road

assisting another driver in icy conditions, he witnessed Defendant wave his entire

arm out the window in a distracting manner. At this time, Defendant was riding as

a passenger in a vehicle traveling on a public highway in the middle of a group of

vehicles all going the same direction. The trooper testified that after Defendant

traveled another one hundred (100) yards past his position on the side of the road,

Defendant changed his arm gesture to a pumping motion with his middle finger

extended. He testified that it was unclear whether Defendant was gesturing to him

all this time or was gesturing to someone in one of the other vehicles. The trooper

testified that he stopped Defendant to investigate the situation but that Defendant

refused to identify himself. Defendant was charged and convicted for his failure to

identify himself, not for the gestures.

 Defendant moved to suppress the officer’s testimony concerning his refusal to

identify himself, based on his contention that the facts did not give rise to establish

 -3-
 STATE V. ELLIS

 Opinion of the Court

“reasonable suspicion” to justify the stop. Based on the trooper’s testimony, however,

the trial court orally denied Defendant’s motion to suppress. Defendant then pleaded

guilty to resisting, delaying, and/or obstructing a public officer during a stop.

 II. Motion to Suppress

 On appeal, Defendant argues that the trial court erred in denying his motion

to suppress.

 A. Standard of Review

 Typically, we review the denial of a motion to suppress to determine “whether

competent evidence supports the trial court’s findings of fact and whether the

findings of fact support the conclusions of law.” State v. Jackson, 368 N.C. 75, 78, 772

S.E.2d 847, 849 (2015).

 In this case, though, the trial court did not make any findings or enter any

written order. Rather, following the trooper’s testimony and counsels’ arguments,

the trial court orally denied Defendant’s motion, stating:

 Based on a review of the evidence, the Court does find
 reasonable suspicion for the stop. In addition, based on the
 totality of the evidence the Court does find probable cause
 for the arrest [for Defendant’s failure to identify himself
 during the stop].

 Our Supreme Court has held, however, that the lack of specific findings in an

order is not fatal to our ability to conduct an appellate review if the underlying facts

are not in dispute. Nicholson, 371 N.C. at 288, 813 S.E.2d at 843 (stating that “when

 -4-
 STATE V. ELLIS

 Opinion of the Court

the facts are not disputed and the trial court did not make specific findings of fact

either orally or in writing, we infer the findings from the trial court’s decision and

conduct a de novo assessment of whether those findings support the ultimate legal

conclusion reached by the trial court”). Here, Defendant offered no evidence to refute

any of the trooper’s testimony. Therefore, we infer the factual findings based on the

trooper’s testimony. See Nicholson, ___ N.C. at ___, 813 S.E.2d at 843 (“[W]e consider

whether the inferred factual findings arising from the uncontested evidence

presented by [the trooper] at the suppression hearing support the trial court’s

conclusion that reasonable suspicion existed to justify defendant’s seizure.”).

 Further, the lack of written conclusions of law is not fatal to meaningful

appellate review, as we review a trial court’s conclusions of law de novo anyway. See

State v. McNeill, 371 N.C. 198, 220, 813 S.E.2d 797, 813 (2018) (“We review

conclusions of law de novo.”). That is, the lack of written conclusions does not inhibit

our ability to determine whether or not the findings inferred from the trooper’s

undisputed testimony support a conclusion that the stop was valid.

 B. Uncontested Facts

 The trial court’s inferred findings based on the trooper’s testimony tend to

show the following:

 Around lunchtime on 9 January 2017, the trooper was assisting a motorist in

a disabled vehicle on the side of U.S. Highway 52 in Albemarle. There had been a

 -5-
 STATE V. ELLIS

 Opinion of the Court

heavy snowstorm in the area a few days prior, snow was still on the ground, and the

temperature was still below freezing. The trooper had been assisting other motorists,

as there had been a number of reported accidents in the area.

 While assisting the motorist, the trooper noticed a group of three or four

passing vehicles, including an SUV in the middle of the pack. As the vehicles passed,

the trooper saw Defendant stick his arm all the way out of the passenger window of

the SUV and make a hand-waving gesture, “a back-and-forth motion [] from [the

trooper] towards [Defendant].” At this point, the trooper “believed that [Defendant,]

was signaling for [his] attention and was requesting for [him] to respond.” The

trooper, therefore, turned his entire body away from the motorist he was assisting

and toward the passing vehicles to get a better look.

 When the SUV was one hundred (100) yards past the trooper’s position, the

trooper observed Defendant still gesturing with his arm, but that his gesture changed

at this point to an up-and-down pumping motion with his middle finger extended:

 [TROOPER:] I know there was a group of three or four cars
 around that passed, and then as this caught my attention,
 I did turn my body and completely look. The vehicle was
 approximately a hundred yards or so past me at this point,
 at which point my body turned and began to look towards
 the traffic. The -- hand of the passenger changed from the
 motioning to a middle finger and was now pumping up and
 down in the air like this (demonstrating).

The trooper was unsure whether Defendant was gesturing all this time at him or at

someone in one of the vehicles around him:

 -6-
 STATE V. ELLIS

 Opinion of the Court

 [COUNSEL:] Okay. So based on this -- this action that you
 saw, what did you believe was occurring?

 [TROOPER:] Actually, two things, sir. I believe, number
 one, this person signaled to me. For what, I don't know.
 And number two, they committed a crime of disorderly
 conduct either towards me or towards someone on the road
 or with other vehicles -- again, something I was unsure of
 and had to conduct a traffic stop to find out both of those
 answers.

The trooper returned to his patrol car and pursued the SUV. During the pursuit, the

trooper did not observe the SUV engage in any traffic violations. The trooper, though,

did pull the SUV over to investigate the matter.

 The trooper approached the SUV and observed Defendant and his wife, who

was in the driver’s seat, take out their cell phones to record the traffic stop. The

trooper knocked on Defendant’s window, whereupon Defendant partially rolled it

down. The trooper asked Defendant and his wife for their identification. Defendant’s

wife eventually gave the trooper her license, but Defendant refused to comply.

 Defendant’s failure to identify himself at that point was a violation of the law.

The trooper then requested that Defendant step out of the vehicle. The trooper

handcuffed Defendant and placed him in his patrol car. While in the patrol car,

Defendant finally gave the trooper his name and told the trooper that he was

gesturing toward him. After running warrants checks which yielded no results, the

trooper issued Defendant a citation for resisting, delaying, and obstructing an officer

and allowed Defendant and his wife to leave.

 -7-
 STATE V. ELLIS

 Opinion of the Court

 C. Analysis

 Defendant argues that the trooper’s stop was not valid, contending that it is

not a crime for one to merely raise his middle finger at an officer, as such conduct is

simply an exercise of free speech protected by the First Amendment of the United

States Constitution.2 U.S. Const. amend. I (“[The legislature] shall make no

law . . . abridging the freedom of speech[.]”). Because Defendant fundamentally

mischaracterizes the basis for the stop, we disagree.

 We note that there are a number of court decisions from across the country

holding that one cannot be held criminally liable for simply raising his middle finger

at an officer.3 This gesture obviously directed at a police officer is simply an exercise

of free speech and, therefore, by itself typically would not give rise to reasonable

suspicion sufficient to justify a stop. Indeed, the United States Supreme Court has

recognized that “fighting words” or gestures obviously directed at an officer are less

 2 As applied to the states via the Fourteenth Amendment of the United States Constitution.
 3 See, e.g., Cruise-Gulyas v. Minard, 918 F.3d 494, 497 (6th Cir. 2019) (“Any reasonable officer
would know that a citizen who raises her middle finger engages in speech protected by the First
Amendment.”); Freeman v. State, 302 Ga. 181, 186, 805 S.E.2d 845, 850 (2017) (“[A] raised middle
finger, by itself, does not, without more, amount to fighting words[.]” (emphasis added)); Duran v.
Douglas, 904 F.2d 1372, 1378 (9th Cir. 1990) (holding vehicle passenger’s obscene gesture at an officer
through an open window, though “inarticulate and crude,” was an expression of disapproval that “fell
squarely within the protective umbrella of the First Amendment”); Swartz v. Insogna, 704 F.3d 105,
110 (2d Cir. 2013) (finding no reasonable suspicion for a stop where “[t]he only act [the officer] had
observed prior to the stop that prompted him to initiate the stop was [the defendant’s] giving-the-
finger gesture.); Cook v. Board of County Commissioners, 966 F. Supp. 1049 (D. Kan. 1997) (holding
that a private citizen has stated a claim for wrongful prosecution for disorderly conduct where the only
evidence against him was that he engaged in a single gesture of displaying his middle finger toward a
police officer).

 -8-
 STATE V. ELLIS

 Opinion of the Court

likely to constitute the crime of disorderly conduct than if those same words or

gestures had been directed toward an ordinary citizen since “a properly trained officer

may reasonably be expected to exercise a higher degree of restraint than the average

citizen.” Houston v. Hill, 482 U.S. 451, 462 (1987) (internal quotations omitted). That

Court explained that “the First Amendment recognizes, wisely we think, that a

certain amount of expressive disorder [toward police officers] not only is inevitable in

a society committed to individual freedom, but must itself be protected if that freedom

would survive.” Id. at 472.

 But the circumstances observed by the trooper in this case regarding

Defendant’s behavior differs from the circumstances in the cases cited in the

preceding footnote. Unlike the circumstances in those other cases, where all that was

involved was an individual expressing contempt to a law enforcement officer, here, it

was not clear to the trooper to whom Defendant was continuously gesturing. Indeed,

Defendant was well past the trooper when he changed his gesture to a pumping

motion with his middle finger extended. While it may be reasonable for the trooper

to suspect that the gesturing was, in fact, meant for him, and therefore maybe

constitutionally protected speech, it was also objectively reasonable for the trooper to

suspect that the gesturing was directed toward someone in another vehicle and that

the situation was escalating. Such continuous and escalating gesturing directed at a

driver in another vehicle, if unchecked, could constitute the crime of “disorderly

 -9-
 STATE V. ELLIS

 Opinion of the Court

conduct.” N.C. Gen. Stat. § 14-288.4(a)(2) (2017) (defining disorderly conduct as

committed where a person “makes or uses any . . . gesture . . . intended and plainly

likely to provoke violent retaliation and thereby cause a breach of the peace”).

 Perhaps the trooper did not see enough to give him “probable cause” to arrest

Defendant for engaging in disorderly conduct. But we conclude that the evidence was

sufficient to establish “reasonable suspicion,” a much lower standard, to initiate an

investigatory stop to determine if Defendant was trying to provoke a motorist. To

meet “reasonable suspicion,” the trooper was not required to rule out that Defendant

was gesturing at him before initiating the stop; indeed, that was the purpose of the

stop. See State v. Williams, 366 N.C. 110, 117, 726 S.E.2d 161, 167 (2012)

(recognizing that “[a] determination that reasonable suspicion exists . . . need not

rule out the possibility of innocent conduct”).4

 It could be argued that Defendant initiated the stop, not because of concerns

for traffic safety, but simply out of anger. But there is no direct evidence that the

trooper initiated the stop in bad faith, as Defendant presented no evidence to that

effect and the trial court made no such finding. Furthermore, and more significantly,

4 We note our holding in In re V.C.R., involving an individual loudly speaking obscenities toward an
officer while standing on a public street. See In re V.C.R., 227 N.C. App. 80, 86, 742 S.E.2d 566, 570
(2013). This Court held that a defendant’s yelling of obscenities in public, though it “may be protected
speech,” does not preclude a determination that the officer had reasonable suspicion to seize the
defendant, as such conduct could lead to a breach of the peace in violation of Section 14-288.4(a)(2) of
our General Statutes. Id.

 - 10 -
 STATE V. ELLIS

 Opinion of the Court

our Supreme Court and the Supreme Court of the United States compel us not to

consider an officer’s subjective reason for initiating a stop in determining whether

reasonable suspicion existed. Nicholson, 371 N.C. 284, 293, 813 S.E.2d 840, 846

(2018) (stating that the “officer’s subjective opinion is not material” in determining

whether reasonable suspicion exists); Whren v. United States, 517 U.S. 806, 813

(1996) (holding that our jurisprudence “foreclose[s] any argument that the

constitutional reasonableness of traffic stops depends on the actual motivations of the

individual officers involved”). Therefore, we affirm the trial court’s order denying

Defendant’s motion to suppress based on the presence of “reasonable suspicion” for

the initial stop.5

 IV. Sentencing

 Defendant argues that the trial court erred in calculating his Prior Record

Level (“PRL”) as III. Specifically, he contends that the trial court improperly counted

 5 The State argues, as an alternate legal basis justifying the stop, that the trooper’s traffic stop
was justified under the judicially-recognized “community caretaking” exception, which allows an
officer to initiate a stop even without the presence of reasonable suspicion of criminal conduct, so long
as he has a reasonable belief that an individual is in need of aid. State v. Sawyers, ___ N.C. App. ___,
___,786 S.E.2d 753, 758 (2016). But it is hard for us to fathom why the trooper would have believed
that Defendant and his wife were in need of care. There is no basis to believe that the middle-finger
gesture is a sign of distress in Stanly County. And even if there was some basis to make the initial
stop based on a concern that Defendant or his wife were in distress, any such concern rapidly
dissipated when the officer observed their filming and protesting the stop as he approached the SUV,
well before he asked Defendant for his identification.
 In any event, we affirm the trial court’s order based on the trial court’s legal reasoning that
the trooper had “reasonable suspicion,” notwithstanding that the State did not rely on this legal basis
in its appellate argument. Indeed, the State, as appellee, was not required to make any legal
argument. See, e.g., Williams v. Williams, 339 N.C. 608, 453 S.E.2d 165 (1995) (affirming lower court
though appellee did not file a brief); Bunting v. Bunting, 2019 N.C. App. LEXIS 607 (2019) (same).

 - 11 -
 STATE V. ELLIS

 Opinion of the Court

a past conviction based on an error in the State’s PRL worksheet.6 The State concedes

this point and agrees that Defendant should have been sentenced at PRL II.

 We agree that Defendant, indeed, should have been sentenced at PRL II. The

State bears the burden of proving the existence of a defendant’s prior convictions, but

that burden may be satisfied by stipulation of the parties. N.C. Gen. Stat. § 15A-

1340.21(c) (2017). “Once a defendant makes this stipulation, the trial court then

makes a legal determination by reviewing the proper classification of an offense so as

to calculate the points assigned to that prior offense.” State v. Arrington, ___ N.C.___,

___, 819 S.E.2d 329, 333 (2018). A PRL is a question of law which we review de novo.

State v. Gardner, 225 N.C. App. 161, 167, 736 S.E.2d 826, 830 (2013).

 When determining a PRL in misdemeanor sentencing, level II is achieved

when a defendant has between one and four prior convictions, while level III requires

at least five prior convictions. N.C. Gen. Stat. § 15A-1340.21(b) (2017). Here, the

parties stipulated that a prior conviction for “Expired Operators’ License” was a level

2 misdemeanor, making it the fifth prior conviction in Defendant’s history. In reality,

at the time of Defendant’s current offense, possession of an expired operator’s license

was an infraction. See N.C. Gen. Stat. § 20-35(a2) (2017); N.C. Gen. Stat. § 15A-

 6 Defendant did not object to his sentencing at trial, but his arguments are still preserved.
Failure to appeal sentencing does not waive appellate review where a defendant argues that “[t]he
sentence imposed was unauthorized at the time imposed, exceeded the maximum authorized by law,
was illegally imposed, or is otherwise invalid as a matter of law.” State v. Meadows, ___ N.C. ___, ___,
821 S.E.2d 402, 406 (2018) (quoting N.C. Gen. Stat. § 15A-1446(d)(18) (2017)).

 - 12 -
 STATE V. ELLIS

 Opinion of the Court

1340.21(b) (2017) (“In determining the prior conviction level, a prior offense may be

included if it is either a felony or a misdemeanor[, but not an infraction,] at the time

the offense for which the offender is being sentenced is committed.”). Without this

infraction, Defendant’s history only shows four prior eligible convictions.

 We note that, in light of our Supreme Court’s recent decision in State v.

Arrington, it would appear that the parties’ stipulation to the classification of

Defendant’s conviction as a misdemeanor is binding on this Court. Our Supreme

Court in Arrington held that the defendant’s stipulation to the existence of a prior

conviction in tandem with its classification was “properly understood to be a

stipulation to the facts of his prior offense and that those facts supported its []

classification,” and was therefore binding on the courts as a factual determination.

Arrington, ___ N.C. at ___, 819 S.E.2d at 335.

 However, Arrington is distinguishable from the present circumstance. In

Arrington, the defendant stipulated to the appropriate classification of his prior

conviction where two possible classifications existed depending on the offender’s

factual conduct in carrying out the offense. Arrington, ___ N.C. at ___, 819 S.E.2d at

333. Here, there is no such ambiguity. As a matter of law, no misdemeanor category

crime for possession of an expired operators’ license existed at the time Defendant

was sentenced for his current offense. Therefore, there is no factual basis which

would support a misdemeanor classification for this conviction and, as a matter of

 - 13 -
 STATE V. ELLIS

 Opinion of the Court

law, the parties may not stipulate to the same. Our de novo review shows that this

conviction should not have been included in determining Defendant’s PRL.

 After removing Defendant’s conviction for Expired Operators’ License from

consideration, we conclude that the trial court properly considered Defendant’s

remaining four prior convictions, giving him a PRL of II.7 N.C. Gen. Stat. § 15A-

1340.21(b) (“The prior conviction levels for misdemeanor sentencing

are: . . . Level II - - At least 1, but not more than 4 prior convictions[.]”).

 V. Conclusion

 It was not obvious to the trooper that Defendant was simply engaging in free

speech toward him when he was gesturing out of his vehicle window. Rather, based

on the totality of the circumstances as inferred from the trooper’s unchallenged

testimony, the trooper had reasonable suspicion that Defendant was engaging in

escalating disorderly conduct toward another vehicle to justify the stop. And we hold

that the trooper was justified in further detaining Defendant when he failed to

provide his identity during the stop. As such, we conclude that the trial court did not

err in denying Defendant’s motion to suppress.

 7 The worksheet stipulated to by the parties shows five additional convictions, apart from the
Expired Operators’ License infraction. But Defendant was convicted of two of these offenses on the
same day, and the trial court rightfully considered only one in calculating his PRL. N.C. Gen. Stat. §
15A-1340.21(d) (2017) (“[I]f an offender is convicted of more than one offense in a single session of
district court, or in a single week of superior court or of a court in another jurisdiction, only one of the
convictions may be used to determine the prior conviction level.).

 - 14 -
 STATE V. ELLIS

 Opinion of the Court

 However, we conclude that Defendant should have been sentenced at PRL II,

rather than III. We, therefore, remand to the trial court for the limited purpose of

resentencing accordingly.

 AFFIRMED IN PART; REMANDED IN PART.

 Judge BRYANT concurs.

 Judge ARROWOOD dissents by separate opinion.

 -2-
 No. COA18-817 – State v Ellis

 ARROWOOD, Judge, dissents.

 Because I do believe there was insufficient evidence to support a traffic stop of

the car in which defendant was riding as a passenger, I dissent.

 I. Facts

 Defendant was arrested on 9 January 2017, after he refused to provide a

highway patrol officer his identification when the trooper stopped a car driven, by his

wife, in which he was the passenger. The trooper initiated the traffic stop after

defendant extended his middle finger in the trooper’s direction, forming the gesture

colloquially known as “shooting him the bird,” and started pumping his fist up and

down in the air. At the time of the incident, the trooper was helping someone else on

the side of the road as the defendant and his wife passed him in their vehicle. The

trooper admitted that he did not witness any traffic violation but testified that his

reason for the stop was two-fold: (1) he believed they may have been motioning to

him for assistance; and (2) he believed they may have been engaging in disorderly

conduct by provoking other vehicles on the road to violence.

 When the trooper approached the car and attempted to open the passenger

door, he saw that both the driver and defendant were videotaping the incident on

their phones. The driver and defendant said repeatedly, “You’re being recorded.

What did we do wrong?” and “This is not a stop-and-ID state.” The trooper insisted

on taking identification from both of them so he could run warrants checks, and he

cited defendant for resisting a public officer when he refused to identify himself.
 STATE V. ELLIS

 ARROWOOD, J., Dissents

 II. Standard of Review

 Defendant filed a motion to suppress, claiming the traffic stop was unlawful

and therefore his resistance was lawful. The trial court orally denied the motion

without entering any written findings or conclusions.

 In evaluating a trial court’s denial of a motion to suppress
 when the facts are not disputed and the trial court did not
 make specific findings of fact either orally or in writing, we
 infer the findings from the trial court’s decision and
 conduct a de novo assessment of whether those findings
 support the ultimate legal conclusion reached by the trial
 court.

State v. Nicholson, 371 N.C. 284, 288, 813 S.E.2d 840, 843 (2018) (footnote omitted).

 III. Discussion

 The State argued in its brief that the trooper’s traffic stop was justified under

the “community caretaking” exception. The majority properly rejects that argument.

This Court has found that hearing “mother f****r” yelled from a moving vehicle was

not an objectively reasonable basis for a traffic stop under the “community

caretaking” exception. State v. Brown, ___ N.C. App. at ___, 827 S.E.2d 534 (2019).

As in Brown, where the deputy heard the obscenity and unreasonably stopped the

passing car, here, the trooper stopped the car after defendant shot him the bird.

 I therefore agree with the majority that there is no reasonable basis for the

“community caretaking” argument put forth by the State. However, I disagree with

the majority’s conclusion that a “reasonable suspicion” argument could justify the

 2
 STATE V. ELLIS

 ARROWOOD, J., Dissents

lower court’s ruling.

 “The Fourth Amendment to the United States Constitution and Article I,

Section 20 of the North Carolina Constitution prohibit unreasonable searches and

seizures.” State v. Smathers, 232 N.C. App. 120, 123, 753 S.E.2d 380, 382 (2014)

(citing U.S. Const. amend. IV; N.C. Const. art. I, § 20). “Traffic stops are recognized

as seizures under both constitutions.” Id. “[T]raffic stops are analyzed under the

‘reasonable suspicion’ standard created by the United States Supreme Court[.]” Id.

(citing Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889 (1968)).

 “[A] brief, investigatory [traffic] stop” is permitted if the officer has a

“reasonable, articulable suspicion that criminal activity is afoot.” Illinois v.

Wardlow, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 576 (2000). “While ‘reasonable

suspicion’ is a less demanding standard than probable cause and requires a showing

considerably less than preponderance of the evidence, the Fourth Amendment

requires at least a minimal level of objective justification for making the stop.” Id.

“A court sitting to determine the existence of reasonable suspicion must require the

[trooper] to articulate the factors leading to that conclusion . . . .” United States v.

Sokolow, 490 U.S. 1, 10, 104 L. Ed. 2d 1, 12 (1989).

 “[I]n determining whether the seizure and search were ‘unreasonable’ our

inquiry is a dual one–whether the officer’s action was justified at its inception, and

whether it was reasonably related in scope to the circumstances which justified the

 3
 STATE V. ELLIS

 ARROWOOD, J., Dissents

interference in the first place." Terry, 392 U.S. at 19-20, 20 L. Ed. 2d at 905. To

determine whether an officer acted reasonably, “due weight must be given, not to his

inchoate and unparticularized suspicion or ‘hunch,’ but to the specific reasonable

inferences which he is entitled to draw from the facts in light of his experience.” Id.

at 27, 20 L. Ed. 2d at 909. A court must consider the totality of the circumstances to

determine whether a reasonable suspicion exists. State v. McClendon, 130 N.C. App.

368, 377, 502 S.E.2d 902, 908 (1998), aff’d, 350 N.C. 630, 517 S.E.2d 128 (1999).

 Here, the majority concludes that the trooper had a reasonable, articulable

suspicion that defendant was committing the crime of disorderly conduct. The

inquiry is two-fold: whether the trooper had a minimal objective justification to make

the stop and whether the stop was reasonably related in scope to the perceived

disorderly conduct.

 While the majority cites a number of cases which found that one cannot be held

criminally liable for raising one’s middle finger at an officer, the majority attempts to

differentiate the case sub judice by finding it was objectively reasonable for the officer

to suspect the gesture was meant for someone in another vehicle. The majority

believes that “such continuous and escalating gesturing directed at a driver in

another vehicle, if unchecked, could constitute the crime of ‘disorderly conduct.’ ”

 The majority presents no evidence to support that defendant’s gesture was

“continuous and escalating.” From the officer’s testimony, defendant’s gesture simply

 4
 STATE V. ELLIS

 ARROWOOD, J., Dissents

turned from a hand-waving gesture to flipping the bird. There was no mention that

the car was speeding, that the horn was being honked, or any other kind of intensified

activities. In fact, the officer testified that he had no issues when pulling the car over.

He further testified that when he approached the passenger side of the car where the

defendant was sitting the window was rolled up, so at some point defendant had

stopped his gesturing out of the window. Simply changing from a waving to an

obscene gesture is not enough to support an objective conclusion that a public

disturbance was imminent.

 Our General Statutes define disorderly conduct in a number of ways, but the

one the majority chooses to cite is as “a public disturbance intentionally caused by

any person who . . . [m]akes or uses any utterance, gesture, display or abusive

language which is intended and plainly likely to provoke violent retaliation and

thereby cause a breach of the peace.” N.C. Gen. Stat. § 14-288.4(a)(2) (2017). There

are no facts presented here that support the contention that defendant’s gesture was

an attempt to intentionally provoke a violent retaliation, nor that it would cause one.

There is no testimony or indication that anyone other than the trooper saw it. There

was also no indication that the vehicle was creating any danger to other motorists on

the road.

 I do not believe that this action was sufficient to justify the trooper in becoming

alert “to a potential, future breach of the peace,” because he did not see any evidence

 5
 STATE V. ELLIS

 ARROWOOD, J., Dissents

of aggressive driving or other interactions between the vehicles on the road that

would suggest road rage. If that was truly his concern he could have followed the

vehicle further to see if there was evidence of some road rage toward other vehicles.

He did not do so, nor did he testify that he saw any improper driving. He chose not

to take any actions to determine if road rage was occurring. Instead, he initiated an

improper search and seizure to engage in an improper fishing expedition to find a

crime with which to charge the defendant who had directed an obscene gesture to him

moments earlier.

 Even viewing the evidence in a light most favorable to the State, what we have

here is a passenger in a vehicle making an uncalled-for obscene gesture. While

defendant’s actions were distasteful, they were, in my opinion, within the realm of

protected speech under the First Amendment of the United States Constitution.

Given that this was protected speech, I believe that the stop was not supported under

the reasonable suspicion test of the Fourth Amendment.

 In conclusion, extending one’s middle finger to a police officer from a moving

vehicle, while tasteless and obscene is, in my opinion, protected speech under the

First Amendment and therefore cannot give rise to a reasonable suspicion of

disorderly conduct. “[T]he First Amendment recognizes, wisely we think, that a

certain amount of expressive disorder not only is inevitable in a society committed to

 6
 STATE V. ELLIS

 ARROWOOD, J., Dissents

individual freedom, but must itself be protected if that freedom would survive.”

Houston v. Hill, 482 U.S. 451, 472, 96 L. Ed. 2d 398, 418 (1987).

 Therefore, I dissent and vote to reverse the trial court’s order denying the

motion to suppress and would vacate the conviction.

 7